*This opinion is subject to revision before final publication in the Pacific Reporter*

**2020 UT 50**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Appellee,*

*v.*

DAVID EDWARD DROMMOND, JR.,
*Appellant.*

No. 20080252
Heard April 30, 2013
Reheard February 10, 2020
Filed July 17, 2020

On Direct Appeal

Second District, Farmington
The Honorable Jon M. Memmott
The Honorable Robert J. Dale
No. 051701317

Attorneys:

Sean D. Reyes, Att'y Gen., Christopher D. Ballard,
Asst. Solic. Gen., Salt Lake City, for appellee

Scott L. Wiggins, Salt Lake City, for appellant

JUSTICE HIMONAS authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE LEE,
JUSTICE PEARCE, and JUSTICE PETERSEN joined.

JUSTICE HIMONAS, opinion of the Court:

### INTRODUCTION

¶1 David Drommond, Jr., shot and killed his ex-wife. After he pleaded guilty to aggravated murder, Drommond was sentenced by a jury at a penalty-phase trial to life in prison *without* the possibility of parole—not to twenty years to life in prison *with* the possibility of parole as he had hoped. Drommond challenges

that sentence, arguing that it should not stand because his penalty-phase trial was fraught with mistakes and his trial counsel was ineffective. We affirm.

**BACKGROUND**

¶2　We split the facts into five sections. The first section recounts Drommond's murder of his ex-wife and how he later pleaded guilty to aggravated murder, in part so the State wouldn't seek the death penalty. The second summarizes pretrial motions that Drommond's counsel filed and the trial court's corresponding rulings. The third details the evidence at Drommond's penalty-phase trial. The fourth depicts the trial's closing arguments and the jury's verdict. And the last describes Drommond's appeal to this court and the later rule 23B hearing that the trial court held to enter findings of fact on one of Drommond's claims for ineffective assistance of counsel.

I. THE MURDER AND THE GUILTY PLEA

¶3　On the morning of August 28, 2005, Janeil Reed, Drommond's ex-wife, went with her father to Drommond's apartment to drop off their children for a visit. Reed's father, Neil Bradley, waited for her in the car. Upon arriving, the children ran up the stairs to Drommond's apartment door and were let inside. Reed went up the stairs to the door, too, carrying a box of items that Drommond had asked her to bring.

¶4　Reed and Drommond stood just inside the doorway, talking. The conversation ended abruptly when Drommond pulled a handgun from his waistband and shot Reed once, hitting her in the arm and chest area. Reed screamed and stumbled back, falling partway down the front stairs of the apartment. Drommond followed her, stepping out of the doorway to the top of the stairs. He then raised the gun (so that it was three or four feet from Reed's head) and pulled the trigger again, this time shooting her in the head. She died very quickly.

¶5　Hearing the shots, Bradley darted from his car toward Drommond, hoping to detain him. At the same time, Drommond's roommate, Ryan Zimmer—who had been outside as well—came toward Drommond. Zimmer stopped when he saw that the Drommond children "were just right inside the doorway" of the apartment. He told them to stay in the apartment and closed the door.

¶6　Bradley came running up the stairs toward Drommond, and Drommond shot him. The bullet pierced Bradley's arm and

entered his body. (Bradley survived his wounds.) Bradley and Zimmer tried to wrestle the gun away from Drommond. They eventually received help from Jason Von Weller, a neighbor, who stripped the gun from Drommond. Drommond tried to get the gun back but was pinned down until the police arrived and arrested him.

¶7    The State charged Drommond with aggravated murder, attempted murder, and violating a protective order. Drommond was then evaluated for competency by four court-appointed psychologists: Randal Oster, John Malouf, Nancy Cohn, and Stephen Golding. Each psychologist diagnosed him with a different mental health problem, but each concluded that Drommond was competent to proceed.

¶8    Next, Drommond pleaded guilty to aggravated murder. As part of the plea deal, the State dismissed the remaining charges and agreed not to seek the death penalty.

## II. THE PENALTY-PHASE TRIAL: PRETRIAL MOTIONS

¶9    After Drommond pleaded guilty to aggravated murder, a penalty-phase jury trial was held. The jury's task was to decide whether Drommond should serve a life sentence *without* the possibility of parole or twenty years to life *with* the possibility of parole.

¶10 Before the penalty-phase trial, Drommond filed two motions relevant to this appeal. First, he filed a motion asking the trial court for confrontation rights at sentencing. The trial court denied the motion, holding that hearsay would be admissible at the penalty-phase trial if (1) it was reliable, (2) Drommond had the opportunity to rebut it, and (3) it was not unfairly prejudicial. Second, Drommond filed a motion asking the court to limit impermissible victim-impact evidence at the penalty-phase trial. The court held that victim-impact evidence would be admissible at the penalty-phase trial as long as it wasn't "unfairly prejudicial" and didn't "make comparative judgments about the worth of the victim's life in comparison to the life of the defendant."

## III. THE PENALTY-PHASE TRIAL: EVIDENCE

¶11 The jury received evidence at trial about (A) Drommond's relationship with Reed, (B) his mental health problems after their divorce, (C) his desire to keep her from dating or marrying someone else, (D) his bipolar disorder at the time of the murder, (E) the murder itself, (F) his statements after

the murder, and (G) the impact of the murder on the Drommond children. We summarize below the relevant parts of that testimony.

*A. Drommond's Relationship with Reed*

¶12 Bradley (Reed's father) and Melina Yorke (Reed's friend) testified about Reed and Drommond's relationship, which began in 1994. According to Yorke, in August 1995, Reed told Yorke that she had talked to a male friend from high school at a music store, and that when Drommond found out that the two had talked, his temper snapped. Yorke said that Drommond choked Reed, leaving bruises on her neck.

¶13 Despite this incident, the couple married a short while later. Reed and Drommond later had two children. Bradley testified that when Drommond lost his job in about 2002, the marriage deteriorated, and, by the beginning of 2005, Reed and Drommond had divorced.

¶14 Bradley testified that soon after the divorce—in March 2005—Drommond strangled Reed to the point that she thought she would die because she had used his cell phone to call another man and had incurred a large bill. After the strangling, Reed obtained a protective order against Drommond, but she agreed to continue taking the children to visit him. Bradley testified that Drommond also frightened Reed with threatening emails in August 2005, causing Bradley to stay periodically at Reed's house at night.

*B. Drommond's Mental Health Problems*
*After the Divorce*

¶15 After the divorce, Drommond went to live with his parents and stayed there until June 2005. Dr. Linda Gummow—a neuropsychologist and Drommond's expert witness at trial—detailed much of Drommond's mental health history during this time.

¶16 Dr. Gummow first outlined Drommond's mental health. She said that Drommond was diagnosed with major depressive disorder at the end of 2004, and at the beginning of the next year, he was diagnosed with bipolar disorder. Bipolar disorder, explained Dr. Gummow, is "a major mood disorder." She further explained that, to be diagnosed with bipolar disorder, a person must have had at least one manic episode—which is an "episode[] of very high mood, way beyond normal elation"—and episodes of depression, which are episodes of "very extremely low moods."

¶17 A few months after the divorce, testified Dr. Gummow, Drommond cut himself, attempted suicide several times, and had "hostile thoughts" toward Reed and his own family. As a result, he was admitted to Lakeview Hospital at the beginning of May 2005, where he stayed for about five days.

¶18 Dr. Gummow said that while Drommond was at Lakeview Hospital, he was treated by several physicians and received many diagnoses of his mental health problems. At various times at the hospital, Drommond was diagnosed with bipolar disorder not otherwise specified (bipolar disorder NOS),[1] schizoaffective disorder, and—upon discharge—bipolar disorder one.[2]

¶19 Dr. Gummow testified that after being discharged from Lakeview Hospital, Drommond had "no treatment" other than being "given some bottles of pills." Dr. Gummow said that this was a mistake—that he should have seen a mental health professional once a week, that "his medication should have been monitored," and that "his moods should have been tracked very regularly."

*C. Drommond's Desire to Prevent Reed*
*from Dating or Marrying Someone Else*

¶20 As mentioned above, Drommond lived with his parents after the divorce. But at the end June 2005—about a month after he was released from Lakeview Hospital—he moved into an apartment with some roommates.

¶21 Drommond's roommate, Rian Carlson, testified that, a couple of months before the murder, Drommond asked Carlson to get him a gun so the two could start a "bounty hunter service" or, more accurately, so Drommond could have the gun to use as an "an intimidation factor." Carlson said that he obtained a handgun

---

[1] According to Dr. Gummow, bipolar disorder NOS is the diagnosis that a physician gives a patient when the physician does not know what type of bipolar disorder the patient has.

[2] Dr. Gummow explained that there are "several different types of bipolar disorders" but that "bipolar disorder one means you've had a clear manic episode and you have an episode of depression, multiple."

about a month before the murder and gave it to Drommond. That was the handgun that Drommond would use to murder Reed.

¶22 Carlson testified that he and Drommond eventually shared their "bounty hunter idea" with a friend named Michael Hansen. Carlson testified that Drommond talked with him and Hansen about how they were going to "scare" and "rough [] up" people who owed him money. The group never followed through with any of those plans, and the group's focus soon shifted to Reed.

¶23 Carlson explained at trial that Drommond found out that Reed was dating someone, and he didn't like it. He wanted to put a stop to it. So, testified Carlson, two or three weeks before the murder, Drommond talked with him and Hansen about scaring Reed out of dating by breaking into her house and cutting her phone line. Carlson told the jury that the group never did so but that Drommond did have Hansen drive by Reed's house and her boyfriend's house to "check it out."

¶24 Detective Lloyd Kilpack, who investigated Reed's murder, testified that Hansen told him in an interview that Drommond even paid Hansen $400 to break into Reed's house to tell her not to marry her fiancé and to drive by Reed's house and her fiancé's to jot down the license plate numbers of the vehicles parked outside.[3] (Hansen never did so.) Detective Kilpack also testified that Hansen told him that, on the day before the murder, Drommond again asked Hansen to break into Reed's house and scare her out of getting married, reminding Hansen that he had paid him $400 to do so. Detective Kilpack added that Hansen even showed him a text message from Drommond in "which Mr. Hansen was reminded that he was given $400 by Mr. Drommond for this particular situation and driving by the house." According to Detective Kilpack's testimony, Hansen refused to go through with it and offered to return Drommond the money. Detective Kilpack testified that he saw the following text message from Drommond to Hansen in response: "I've been doing this for years.

---

[3] Detective Kilpack also testified that Drommond's father told him that, a few weeks before the murder, Drommond "told his mother that he was going to hurt [Reed]" and "told [his mother] not to be a hero." According to Kilpack, Drommond told his mother "that if he wasn't able to do it, he had an army that would accomplish it for him."

Don't worry about it. I'll take care of this." Apart from Kilpack's testimony about the text messages, we refer in this opinion to the testimony in this paragraph as the Kilpack–Hansen Hearsay Testimony.

### D. Drommond's Bipolar Disorder

¶25  Dr. Gummow testified that, when Drommond murdered Reed, he suffered from bipolar disorder NOS, childhood onset. This was important, she said, "because the bipolar disorder has a lot to do with Mr. Drommond's criminal behavior and understanding what happened, and also understanding what might happen in the future with regard to him."

¶26 Dr. Gummow explained how people with bipolar disorder might generally behave. She explained that people experiencing a manic episode are "extremely active," "talk too fast," "move too fast," and are "not rational." She also said that those experiencing manic episodes are likely to "get involved in legal trouble" because, for example, "they're out and about and they irritate people, they get in fights"—all that, because they "don't know that they're high." A person experiencing a manic episode "may think that they've lost control of themselves," said Dr. Gummow, "but often they're not aware of the fact that their behavior is going off the chart." Dr. Gummow testified that bipolar disorder is "incurable"—that "it can be controlled, minimized, and people can be comfortable, but it's always there."

¶27  Besides opining that Drommond had bipolar disorder NOS, Dr. Gummow also discussed the diagnoses of the four court-appointed psychologists who had determined that Drommond was competent. Each psychologist—none of whom were called as witnesses at trial—had diagnosed Drommond differently: bipolar disorder one (Dr. Oster); narcissistic personality disorder (Dr. Malouf); personality disorder not otherwise specified, with prominent narcissistic and borderline features (Dr. Cohn); and major depression and severe cluster B personality disorder (Dr. Golding).[4] Dr. Gummow conceded that Dr. Cohn's and Dr. Golding's diagnoses were supported by some

---

[4] The parties do not point to clear definitions of these personality disorders in their briefs and so we do not define them here.

evidence and that they would be harder to treat than bipolar disorder and that they couldn't be treated with medication.[5]

### E. Evidence About the Murder

¶28 Several witnesses testified about the murder itself, too. The jury heard that Drommond shot Reed twice, that he shot Bradley too, and about the later struggle to disarm and subdue Drommond. *See supra* ¶¶ 3–8. And a medical examiner testified that an autopsy confirmed that Reed died from her wounds.

### F. Drommond's Postmurder Statements

¶29 The jury also heard testimony about things Drommond told Carlson, Sean Buchanan (Drommond's cellmate), and Kristina Shakespeare (Drommond's cousin) after the murder.

¶30 First, Carlson testified that when he went to visit Drommond in jail after the murder, Drommond expressed no remorse and seemed to think it was "a joke that he was there."

¶31 Then, Detective Kilpack testified about his interview with Buchanan. Kilpack testified that Buchanan said that Drommond told him (1) that he wanted Reed's sister to be "taken out of the box;"(2) that he wanted Reed's sister's "neck broken" or for her to be "killed" so "she could not take care of his children;" (3) that he should have killed the entire Bradley family; (4) that he planned to be released from custody after six or seven years, after which "they will see I'm crazy" and "that the bitch had it coming;" and (5) that "he had popped [Reed] with precision" and that as he said so, "he was smiling." We refer to this testimony as the Kilpack–Buchanan Hearsay Testimony.

¶32 Detective Kilpack also testified about his interview with Kristina Shakespeare. Kilpack said that, in the interview, Shakespeare shared how Drommond told her after the murder that "he felt great because [Reed] was gone" and that "if he had the power to do so, he would kill the entire Bradley family." We refer to this testimony as the Kilpack–Shakespeare Hearsay Testimony.

---

[5] Dr. Golding's diagnosis was characterized at trial as personality disorder not otherwise specified with cluster B traits.

### G. The Impact of the Murder on the Drommond Children

¶33  Finally, Reed's sister testified that Reed's children "miss their mother very much." A photograph of Reed and her two children was also admitted into evidence.

## IV. THE PENALTY-PHASE TRIAL: CLOSING ARGUMENTS, JURY INSTRUCTIONS, AND THE VERDICT

¶34  At the close of the penalty-phase trial, Drommond's counsel asked the jury to impose a sentence of twenty years to life in prison, rather than life in prison without the possibility of parole. Drommond's counsel claimed that this sentence was proper because, if Drommond were to have "structure" and "treatment," he could "be normalized."

¶35  After closing argument, Drommond asked the trial court for a special verdict, which would require the jury to find that any "uncharged crimes" presented at trial were proven beyond a reasonable doubt before it could consider them in the sentencing decision. The court rejected this request.

¶36  The jury then deliberated and sentenced Drommond to life in prison without the possibility of parole, and he appealed.

## V. THE APPEAL AND THE RULE 23B REMAND

¶37  After appealing, Drommond filed a motion in 2010 under rule 23B of the Utah Rules of Appellate Procedure. He requested that we remand his case for an entry of finding of facts as to whether his trial counsel was ineffective because he failed to investigate and present expert testimony about the effects of one of Drommond's antidepressant medications, Effexor, on his bipolar disorder.[6]

¶38  After initially rejecting the rule 23B motion, we granted it in 2013. We remanded and directed the lower court to "enter findings of fact as to (1) any adverse effects of Effexor on [Drommond's] bipolar disorder, and (2) whether [Drommond's] trial counsel provided effective assistance when counsel failed to investigate and present expert testimony regarding the possible effects of Effexor on [Drommond's] bipolar disorder."

---

[6] Effexor is a brand name for the antidepressant drug, venlafaxine. For consistency and ease of reference, we refer to the drug in this opinion as Effexor instead of venlafaxine.

¶39 At the rule 23B hearing, Drommond called two expert witnesses—both psychiatrists—to testify: Pablo Stewart and Peter Breggin. The State called its own expert psychiatrist, David Moulton.

¶40 Dr. Stewart testified that treatment with "pretty high doses of Effexor . . . alone could flip one into mania," and that "even if [Drommond] stopped taking the medication, the mania [would have had] a life of its own." He added that "once you're flipped into mania, then . . . you're in a manic state" and "that's going to run its course."

¶41 In the same vein, Dr. Breggin testified that "Effexor causes aggression and impulsivity," that it "should never be given to a patient with mania," and that "it played a considerable role in [Drommond's] actions." Dr. Breggin added that the "meds in combination with bipolar" caused Drommond to become very "disturbed" at Lakeview Hospital. Dr. Breggin said that "once he's that disturbed, that could last for months off the medication." He opined that it wouldn't go away just "because [Drommond] stopped the meds," and that "if he stopped the meds shortly before the violence, then he would have been in withdrawal."

¶42 Contrary to Dr. Stewart and Dr. Breggin, Dr. Moulton (the State's expert witness) testified that "there's nothing in the medical literature that supports that mania in and of itself causes serious violence." Dr. Moulton said that "we don't have evidence that [Effexor] lead[s] to homicide or increase[s] the homicide rate." He added that "[i]f there's any interpretation to be made it's that people on [Effexor] would be less likely to commit a homicide [than] somebody that's not on [Effexor]." He also explained that antidepressant withdrawal causes a "flu-like reaction." It "can cause malaise, headaches, nausea, vomiting, diarrhea," and "some irritability, similar to the irritability someone might experience who has the flu." But those symptoms go away within forty-eight to seventy-two hours or "almost immediately" after one resumes taking the medication.

¶43 After hearing the testimony, the rule 23B court first found that Dr. Moulton's testimony was "the most credible regarding the effects of Effexor on a person with Bipolar Disorder" because of his "training, education, experience, and the way he testified at the evidentiary hearing." The court also found that Drommond "did not take his medications, including Effexor, in July or August 2005." Most importantly, the court found that Drommond had not shown "by a preponderance of the evidence that the effects of

Effexor would [have] still [been] contributing to [his] mental state as late as August 28, 2005."

¶44 The court then found that Drommond's trial counsel had been deficient by not investigating how Effexor affects people with bipolar disorder, but that Drommond wasn't prejudiced by the mistake "[b]ecause the preponderance of the evidence does not support that Effexor contributed to [Drommond's] mental state at the time he committed the homicide."

¶45 With the rule 23B proceedings concluded, we now decide Drommond's appeal. We have jurisdiction under Utah Code section 78A-3-102(3)(i).

## STANDARD OF REVIEW

¶46 Drommond first maintains that he received ineffective assistance of counsel before and during the penalty-phase trial. When raised for the first time on appeal, an ineffective-assistance-of-counsel claim "presents a question of law," which we review for correctness. *State v. Bedell*, 2014 UT 1, ¶ 20, 322 P.3d 697 (citation omitted). And when a claim for ineffective assistance of counsel has been decided at a rule 23B hearing, we review the rule 23B court's "purely factual findings for clear error, but review the application of the law to the facts for correctness." *Taylor v. State*, 2007 UT 12, ¶ 13, 156 P.3d 739.

¶47 Drommond next claims that the trial court erred by holding that he had no constitutional right to confrontation at his penalty-phase trial. This is a question of law, and we review it for correctness. *State v. Timmerman*, 2009 UT 58, ¶ 7, 218 P.3d 590 ("Interpretations of federal and state constitutions are questions of law.").

¶48 Drommond also argues that the trial court erred by ruling that the constitutional right to due process didn't preclude certain victim-impact evidence. This is also a question of law, and thus we review it for correctness. *Id.*

¶49 Drommond last claims that the trial court erred by refusing to instruct the jury that it could consider evidence of uncharged crimes only if it found that the State had proven them beyond a reasonable doubt. We review a trial court's "refusal to give a jury instruction" for abuse of discretion. *State v. Berriel*, 2013 UT 19, ¶ 8, 299 P.3d 1133 (citation omitted). We afford "significant deference" on "issues that are primarily or entirely factual" but "little or no deference" on "issues that are primarily or entirely legal." *Id.*

## ANALYSIS

¶50 Drommond raises four categories of errors on appeal: (1) that he received ineffective assistance of counsel, (2) that hearsay evidence violated his right to confrontation, (3) that victim-impact evidence violated his right to due process, and (4) that evidence of uncharged crimes violated his right to due process. Last, he asserts that the cumulative effect of these alleged errors requires a new penalty-phase trial. For the reasons we detail below, we reject each of these arguments and affirm the jury's verdict.[7]

### I. INEFFECTIVE ASSISTANCE OF COUNSEL

¶51 Drommond argues that his trial counsel was ineffective and that, as a result, he was deprived of his constitutional right to effective assistance of counsel under the Sixth Amendment to the United States Constitution. To show that counsel's assistance was ineffective, thus depriving a defendant of this right, the defendant must meet the two-pronged test that the United States Supreme Court set out in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* requires the defendant to show that (1) "counsel's performance was deficient" and (2) "the deficient performance prejudiced the defense." *Id.* at 687; *see also State v. Newton*, 2020 UT 24, ¶ 20, --- P.3d ---.

¶52 Drommond contends that his trial counsel was ineffective in two ways: first, by not investigating and presenting evidence on how Effexor influenced his bipolar disorder at the time of the murder, and, second, by not presenting at the penalty-phase trial the expert testimony of all four court-appointed psychologists. We

---

[7] Drommond argues that this is a *capital* case. This is relevant, he says, to all of his claims because (1) counsel is held to a higher standard in capital cases for ineffective-assistance-of-counsel claims, (2) the right to confrontation applies to capital sentencing proceedings, (3) victim-impact evidence should be excluded from capital sentencing proceedings, and (4) uncharged crimes can be considered in capital sentencing proceedings only if they are proven beyond a reasonable doubt. He also argues that it allows us to review any palpable error, even if it wasn't objected to below. We need not distinguish between capital and noncapital cases in deciding any of the issues here because, even assuming it is a capital case, Drommond's claims fail.

reject both claims. The first claim fails because, even assuming Drommond's trial counsel's performance was rendered deficient by his failure to investigate and present evidence about the effects of Effexor, Drommond wasn't prejudiced by it. The second claim fails because trial counsel wasn't deficient in not presenting the psychologists' testimony.

*A. Ineffective Assistance of Counsel:*
*Failure to Investigate and Present Evidence on Effects of Effexor*

¶53 Drommond argues that he received ineffective assistance of counsel when his trial counsel failed to investigate the potential role Effexor played in the murder and present expert testimony about it. This claim was remanded to the rule 23B court for findings of fact. The rule 23B court found that, although Drommond's trial counsel was deficient in not investigating the effects of Effexor on bipolar disorder, that mistake didn't prejudice Drommond's defense. The court also found that trial counsel's overall trial strategy was reasonable.

¶54 Drommond disagrees with the rule 23B court's findings for two main reasons. First, he says that the court's findings of fact were clearly erroneous. Second, he argues that he was prejudiced by his counsel's failure to investigate and present evidence on the effects of Effexor on his bipolar disorder. After reviewing both claims, we conclude, first, that Drommond has not shown that the court's findings of fact are clearly erroneous and, second, that he suffered no prejudice as a result of his counsel's failure to investigate and present evidence on the effects of Effexor. This ineffective-assistance-of-counsel claim consequently fails.

1. Findings of Fact

¶55 Drommond disagrees with two of the rule 23B court's findings of fact and contends that they are clearly erroneous. He challenges the court's findings that (1) Dr. Moulton was "the most credible regarding the effects of Effexor on a person with Bipolar Disorder" and (2) Drommond "did not take his medications, including Effexor, in July or August." Drommond, however, hasn't met his burden of showing that the rule 23B court's findings of fact are clearly erroneous.

¶56 "We defer to a trial court's findings of fact after a rule 23B hearing," *State v. Taylor*, 947 P.2d 681, 685 (Utah 1997), and we review them only for clear error, *State v. Sagal*, 2019 UT App 95, ¶ 20, 444 P.3d 572, *cert. denied*, 456 P.3d 389 (Utah 2019). That means we set aside the rule 23B court's factual findings only if

they "are against the clear weight of the evidence," or if we "otherwise reach[] a definite and firm conviction that a mistake has been made." *See State v. Walker*, 743 P.2d 191, 193 (Utah 1987).

¶57 We start with Drommond's challenge to the finding that Dr. Moulton was "the most credible regarding the effects of Effexor on a person with Bipolar Disorder." The trial court based this finding on Dr. Moulton's "training, education, [and] experience, and the way he testified at the evidentiary hearing." Drommond asserts that this finding was "unreasonable and against the clear weight of the evidence" for three reasons.

¶58 First, Drommond contends that Dr. Moulton wasn't credible because he admitted that he had been testifying from the wrong report during the rule 23B hearing. On cross-examination, Dr. Moulton admitted that he was testifying from an earlier version of his report, rather than from the latest version. He clarified, however, that he had created two reports, each dated one week apart from the other, and that his conclusions in each report were the same. The second report, he explained, had merely fine-tuned the first report by adding a heading and revising a few words and sentences for clarity. We think it a real stretch to say that such an innocuous mistake would render Dr. Moulton not credible.

¶59 Second, Drommond complains that Dr. Moulton wasn't credible because he referenced in his report a "serotonin neuron reuptake inhibitor" but conceded in his testimony that such a thing doesn't exist. Dr. Moulton remedied this error at the rule 23B hearing, explaining that he had made a typographical error in his report. He had written "serotonin neuron reuptake inhibitor"—which, he acknowledged, does not exist—instead of "serotonin norepinephrine reuptake inhibitor." Like the first error, this error in no way shows that Dr. Moulton wasn't credible; it shows only that he, like the rest of us, is prone to the occasional typo.

¶60 Third, Drommond complains that Dr. Moulton is not credible because his report "was almost totally devoid of any clinical analysis" of Drommond. When asked about this on cross-examination, Dr. Moulton explained that he had not provided a diagnosis of Drommond because he wasn't asked to do so; he was asked only "to provide what the effects of [Drommond's] medication may have had on this case." Dr. Moulton said that he didn't dispute—indeed he supported—the conclusion that Drommond had bipolar disorder and that he therefore didn't

need to do a clinical analysis. And, he said, a clinical analysis "would not change [his] response that there is no medical literature that supports that [Effexor and other medications that Drommond had been prescribed] lead to serious violence." Given that Dr. Moulton didn't dispute that Drommond had bipolar disorder, we cannot say that his decision not to perform his own clinical analysis of Drommond rendered him not credible.

¶61 In short, Drommond has not shown that the rule 23B court erred, much less clearly erred, in finding that Dr. Moulton was the most credible expert witness.

¶62 Besides challenging the court's finding that Dr. Moulton was the most credible expert, Drommond challenges the factual finding that Drommond "did not take his medications, including Effexor, in July or August." The rule 23B court found that Drommond "stopped taking Effexor at least by July 2005." We first examine the evidence supporting the finding, and then we address Drommond's arguments against it. We conclude that the rule 23B court didn't clearly err in finding that Drommond didn't take Effexor in July or August.

¶63 There was plenty of evidence that supported the finding that Drommond stopped taking Effexor by July 2005. Accordingly, the finding wasn't "so lacking in support" that it is "against the clear weight of the evidence." *438 Main St. v. Easy Heat, Inc.*, 2004 UT 72, ¶ 75, 99 P.3d 801. For example, trial counsel testified at the rule 23B hearing that the two bottles of Effexor that the police had seized after the murder—one of which had been filled in January, the other, in July—were full. That suggests that Drommond did not take Effexor in July 2005. Importantly, Drommond's trial counsel also testified that Drommond told him after the murder, "I don't take those. I don't like them." This evidence strongly supports the rule 23B court's finding that Drommond wasn't taking Effexor in July and August 2005.

¶64 Drommond asserts that these findings were clearly erroneous and that he "proved by a preponderance of the evidence that he had been taking the Effexor up to approximately the time of the homicide." To support his conclusion, Drommond points to (1) evidence that he filled his Effexor prescriptions in May, June, and July 2005; (2) evidence that the police—who seized two bottles of Effexor from Drommond's apartment after the murder—didn't record the exact number of pills in the bottles; (3) Dr. Breggin's and Dr. Stewart's testimonies about Drommond's pharmacy records; (4) Drommond's mother's

testimony that she checked the pill bottles and noticed that the number of pills had decreased; and (5) evidence that he requested his medication after his arrest. Drommond has presented some "plausible evidence," *id.* ¶ 73, that he didn't stop taking Effexor by July 2005, but he has not shown that the court's finding was "so lacking in support" that it was "against the clear weight of the evidence," *id.* ¶ 75.

¶65 We start with Drommond's strongest evidence that he never stopped taking the medications—his first and fifth points. Drommond's first point—that he filled his prescriptions in May, June, and July 2005—is his strongest evidence that he had been taking Effexor in July and August 2005. But that he *filled* the prescriptions for Effexor is not direct evidence that he indeed *took* Effexor in July and August. And Drommond's fifth point—his request for Effexor after his arrest—is perhaps some evidence that he was taking the medication but doesn't establish that he was taking the medication before the murder. As the State suggests, "a factual finding is not clearly erroneous merely because some contrary evidence exists." *See Taylor*, 947 P.2d at 686 (holding that a rule 23B court's finding wasn't clearly erroneous because "enough evidence" supported the court's finding even though the court could have found the opposite but didn't).

¶66 We finish with Drommond's other evidence that he was taking Effexor at the time of the murder (his second, third, and fourth points). The second point—that the police didn't record the number of pills in the bottles—simply shows that nobody knew exactly how many pills were in the bottles. But it didn't contradict Drommond's trial counsel's testimony that the bottles were full. The third point—which highlights testimony from Dr. Breggin and Dr. Stewart—also doesn't undermine the rule 23B court's finding. Although the psychiatrists testified that Drommond took Effexor in August, they had no firsthand knowledge of the matter. Drommond's fourth point—which is about his mother's testimony that he took Effexor—doesn't show that he took Effexor in July or August. His mother's testimony that Drommond took the medication referred only to a two-week period at some time after his stay at Lakeview Hospital and before he moved out of his parents' house at the end of June 2005. Her testimony, then, didn't contradict the court's finding that Drommond stopped taking Effexor by July 2005.

¶67 Drommond has failed to show that the rule 23B court's finding that he had not taken Effexor in July or August 2005 was

against the clear weight of the evidence. As a result, it merits our deference.

2. Lack of Prejudice

¶68 Drommond argues that his trial counsel rendered ineffective assistance when he failed to investigate and present evidence on the effects of Effexor on Drommond's bipolar disorder. We reject this claim because, even assuming Drommond's counsel was deficient in failing to investigate and present evidence on the effects of Effexor, Drommond was not prejudiced by that deficiency.

¶69  To determine whether Drommond was prejudiced (under the second prong of *Strickland*) by the failure to investigate and present evidence, the ultimate question we must answer is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* This inquiry requires us to consider whether the evidence that would have been presented if counsel's performance had not been deficient would have "affect[ed] the 'entire evidentiary picture.'" *Gregg v. State*, 2012 UT 32, ¶ 26, 279 P.3d 396 (alteration in original) (citation omitted). Specifically, we "consider the totality of the evidence, taking into account such factors as whether the errors affect the entire evidentiary picture or have an isolated effect and how strongly the verdict is supported by the record." *Id.* (citation omitted); *see also Caro v. Woodford*, 280 F.3d 1247, 1256–57 (9th Cir. 2002) ("This inquiry . . . compels us to couple the omitted evidence with the mitigating evidence presented at trial and reweigh it against the aggravating evidence to determine whether the omitted evidence 'might well have influenced the jury's appraisal of . . . [the defendant's] moral culpability.'" (second and third alterations in original) (quoting *Williams v. Taylor*, 529 U.S. 362, 397–98 (2000)).

¶70 Drommond argues that the expert testimony flowing from a reasonable investigation "could have documented . . . Drommond's mental status in the penalty phase trial" and could have given the jury "an *explanation* of how the Effexor aggravated his Bipolar Disorder by switching him into a mania that took on a life of its own." He also argues that "[e]xpert testimony would have explained how the Effexor 'flipped' or switched Mr. Drommond into a manic episode, unmasking his underlying psychiatric condition, and that the medication also caused

17

untoward activating side effects that made any mania he might otherwise have experienced much more severe." In short, Drommond believes that the evidence of "Effexor and the whole pharmacologic mismanagement would have been mitigating evidence in the penalty phase trial" and would have "humanize[d] and explain[ed]" Drommond.

¶71 The rule 23B court's findings cut against Drommond's arguments. The rule 23B court found that any expert testimony resulting from an investigation into the effects of Effexor would have shown only that Drommond's "illness was mismanaged pharmacologically between December 30, 2004, and May 2, 2005 when he entered the hospital." Such testimony, the rule 23B court explained, "may have helped the jury understand some of his behavior during those months, but it wouldn't have mitigated [Drommond's] behavior in July and August, including August 28, 2005, the day of the homicide." Critically, the rule 23B court found that "the preponderance of the evidence [did] not support that Effexor contributed to [Drommond's] mental state at the time he committed the homicide." Similarly, it found that the expert testimony wouldn't have shown that "Effexor nor withdrawal from Effexor caused [Drommond] to commit a serious act of violence such as homicide or assault."

¶72 Based on the rule 23B court's factual findings, the omitted evidence wouldn't have affected the entire evidentiary picture of the penalty-phase trial, nor helped mitigate Drommond's moral culpability. And Drommond has not shown that the rule 23B court's factual findings were clearly erroneous. *Supra* ¶¶ 55–67. So, contrary to what Drommond suggests, the omitted evidence wouldn't have shown that Effexor affected Drommond's actions on the day of the murder, thereby mitigating his culpability for the murder. The most it would've done is perhaps mitigate his culpability for the March 2005 strangling incident. But there was other evidence besides the March 2005 strangling incident that Drommond acted with hostility toward Reed, even when not taking Effexor: testimony about the 1995 strangling incident, the threatening emails, Drommond's requests to his friends to scare her out of dating and marrying another man, and the murder itself. Thus any evidence about Effexor's effect on Drommond would have had an isolated effect on the evidentiary picture.

¶73 Deferring to the rule 23B court's factual findings, we conclude that there is no reasonable probability that the omitted evidence would have influenced the jury's appraisal of

Drommond's moral culpability and thereby swayed the jury to give Drommond a more lenient sentence. Put differently, our confidence in the outcome of the penalty-phase trial has not at all been undermined. Thus, even assuming counsel rendered deficient performance by failing to investigate and present evidence on the effects of Effexor on Drommond's bipolar disorder, Drommond wasn't prejudiced by it. He, therefore, cannot show that counsel's failure to investigate and present mitigating evidence about the effects of Effexor on Drommond's bipolar disorder constituted ineffective assistance of counsel.

*B. Ineffective Assistance of Counsel: Failure to Call the Court-Appointed Psychologists*

¶74  Drommond also claims that his counsel was ineffective at the penalty-phase trial by limiting the expert evidence of Drommond's mental state to just Dr. Gummow's testimony. Drommond argues that counsel should have also used as mitigation evidence the evaluations and diagnoses of the four court-appointed psychologists who had evaluated him for competency just after the murder—those of Dr. Oster, Dr. Malouf, Dr. Cohn, and Dr. Golding. We hold that counsel's representation didn't fall below an objective standard of reasonableness. For this reason, this ineffective-assistance-of-counsel claim fails.

¶75 Drommond's trial counsel presented expert testimony about Drommond's mental health problems through Dr. Gummow only. Given its importance to this issue, we briefly recap parts of Dr. Gummow's trial testimony before analyzing whether trial counsel's performance was deficient.

¶76 Dr. Gummow documented Drommond's mental health problems and concluded that, at the time of the murder, Drommond had bipolar disorder NOS. Dr. Gummow claimed that Drommond's bipolar disorder had worsened before the murder because (1) he either hadn't been taking his medication or, if he had been, he had been on the wrong dosage and (2) "his life [had been] falling apart." Also, she believed that Drommond "had not fully accepted the need for psychotropic medication."

¶77 Dr. Gummow explained that, although bipolar disorder cannot be cured, it can be "controlled" and "minimized." More importantly, she said that several factors suggested that Drommond had a good chance of managing his bipolar disorder going forward, in part because he now realized the importance of medication and was taking it.

¶78 Dr. Gummow also discussed the opinions of the four court-appointed psychologists who had diagnosed Drommond with different mental health problems, asserting that her diagnosis—bipolar disorder NOS—was "pretty consistent with everyone else's."

¶79 Dr. Gummow testified that she had reviewed Dr. Oster's and Dr. Malouf's reports and relied on them in part in forming her opinion about Drommond. She acknowledged that Dr. Oster diagnosed Drommond with bipolar disorder one and that Dr. Malouf—who "was not completely convinced" that Drommond had a bipolar disorder—diagnosed Drommond with delusional disorder and "felt there was [a] more psychiatric process more akin to schizophrenia going on." And, on cross-examination, Dr. Gummow agreed that Dr. Cohn's diagnosis (personality disorder not otherwise specified with narcissistic and borderline features) and Dr. Golding's diagnosis (severe cluster B personality disorder not otherwise specified) both found some support in the evidence. And if Dr. Cohn's and Dr. Golding's diagnoses were correct, she conceded, then treatment would be harder.

¶80 Then Dr. Gummow shared why she felt her diagnosis—bipolar disorder NOS—was more correct than theirs. She said that it was more accurate than that of Dr. Cohn and Dr. Golding because her diagnosis fell in line with those of the mental healthcare professionals who had treated Drommond on "multiple occasions" and who had "a much better vantage point" than did Dr. Cohn and Dr. Golding, who had seen only a "snapshot."

¶81 Having reviewed Dr. Gummow's expert testimony, we now turn to whether Drommond's trial counsel was ineffective in his handling of the expert testimony on Drommond's mental state at the time of the murder. To meet the first prong of the *Strickland* standard, a defendant must show "that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687–88. Put differently, a defendant must show that counsel's performance wasn't "reasonable[] under prevailing professional norms." *Id.* at 688.

¶82 "There are . . . countless ways to provide effective assistance in any given case." *Harrington v. Richter*, 562 U.S. 86, 106 (2011) (citation omitted) (internal quotation mark omitted). We need only discern whether the strategy chosen by trial counsel was one of those ways. Drommond's trial counsel chose to call as

a witness a neuropsychologist who testified that she had diagnosed Drommond with bipolar disorder and who maintained that his bipolar disorder was treatable and that treatment would allow him to one day safely reenter society. In so doing, trial counsel chose to focus on that expert's diagnosis rather than the diagnoses of the four court-appointed competency psychologists whom he chose not to call as witnesses. We cannot say that this strategy was unreasonable; far from it.

¶83 If trial counsel had chosen the strategy advocated by Drommond on appeal—calling every court-appointed psychologist to testify— there would have been a serious risk of the jury believing that Drommond didn't have bipolar disorder and instead had a mental health problem that was harder to treat—i.e., a personality disorder. *State v. Ott*, 2010 UT 1, ¶ 39, 247 P.3d 344 ("We note that avoidance of drawing the jury's attention to certain facts or over-emphasizing aspects of the facts is a well-recognized trial strategy."). Indeed, on cross-examination, Dr. Gummow acknowledged that the diagnoses of Dr. Cohn (personality disorder not otherwise specified with narcissistic and borderline features) and Dr. Golding (severe cluster B personality disorder not otherwise specified) were also supported by the evidence and that they would be harder to treat than bipolar disorder.

¶84 Had trial counsel focused on these diagnoses, the jury may have been less likely to believe that Drommond's mental health problems could be treated and, as a result, less likely to impose a sentence that allowed for the possibility of parole. As a result, rather than calling all the psychologists to testify, reasonable counsel could have believed that the jury would feel that the diagnosis of bipolar disorder would be more mitigating than a personality disorder and so called an expert who had diagnosed Drommond with bipolar disorder. *See* George L. Blum, Annotation, *Adequacy, Under Strickland Standard, of Defense Counsel's Representation of Client in Sentencing Phase of State Court Death Penalty Case—Failure to Present Evidence Regarding Client's Mental Illness or Dysfunction, Other than as Result of Lack of Investigation*, 7 A.L.R. 7th Art. 3 (2016) ("Diagnoses of specific mental illnesses, which are associated with abnormalities of brain and can be treated with appropriate medication, are likely to be regarded by the jury in a capital case as more mitigating than generalized personality disorders, and for good reason, as involuntary physical alteration of brain structures, with its

attendant effects on behavior, tends to diminish moral culpability, altering the causal relationship between impulse and action.").

¶85 True, one other psychologist—Dr. Oster—diagnosed Drommond with a type of bipolar disorder, and trial counsel didn't call him as a witness. That testimony, however, would have been cumulative. And "[a]dditional, but cumulative, evidence which could have been presented does not . . . establish ineffective assistance." *Parker v. Allen*, 565 F.3d 1258, 1279 (11th Cir. 2009); *see also Farina v. State*, 937 So. 2d 612, 624 (Fla. 2006) ("[C]ounsel does not render ineffective assistance by failing to present cumulative evidence."); *State v. Oliver*, 820 P.2d 474, 478 (Utah Ct. App. 1991) (holding that trial counsel wasn't deficient by failing to present evidence when "[a]ny additional evidence would have been cumulative"). Moreover, Dr. Gummow acknowledged that Dr. Oster had also diagnosed Drommond with bipolar disorder. By calling only Dr. Gummow to testify, counsel enjoyed the best of both worlds: he bolstered Dr. Gummow's diagnosis with that of Dr. Oster without allowing Dr. Oster to be subject to the State's cross-examination—in which the State would have no doubt brought up once again Dr. Cohn's and Dr. Golding's less favorable diagnoses.

¶86 In short, Drommond's counsel wasn't deficient by choosing not to present the testimony of the four court-appointed competency experts. Drommond's second claim for ineffective assistance of counsel fails.

## II. RIGHT TO CONFRONTATION

¶87 Drommond claims that his rights to confrontation under both the United States and Utah Constitutions were violated at trial because the jury heard certain hearsay statements, and he was unable to cross-examine the declarants of those statements. The State replies that the trial court didn't err because there is no constitutional right to confrontation at sentencing and, in any event, the testimony was reliable and not unfairly prejudicial.

¶88 We recognize below that our case law is somewhat inconsistent as to whether the right to confrontation applies at sentencing. But we need not decide the issue here because any error in admitting the hearsay statements was harmless beyond a reasonable doubt.

### A. The Right to Confrontation at Sentencing Under the U.S. and Utah Constitutions

¶89 Drommond alleges that both the Confrontation Clause of the Sixth Amendment to the U.S. Constitution and article I, section 12 of the Utah Constitution apply at sentencing.[8] The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. Similarly, article I, section 12 of the Utah Constitution gives the accused "[i]n criminal prosecutions . . . the right . . . to be confronted by the witnesses against him." When the right to confrontation applies and a witness does not testify, a "party can only introduce [the] witness's testimonial statements into evidence if the witness is

---

[8] Drommond also argues that the hearsay testimony violated two other provisions of the Utah Constitution: article I, section 7 (the due process provision) and article I, section 9, which says in part that "[p]ersons arrested or imprisoned shall not be treated with unnecessary rigor." The argument based on these constitutional provisions, however, is inadequately briefed because Drommond does not provide any analysis about why those provisions specifically supply the right to confront witnesses at sentencing. *See Bank of Am. v. Adamson*, 2017 UT 2, ¶ 13, 391 P.3d 196 ("A party must cite the legal authority on which its argument is based and then provide reasoned analysis of how that authority should apply in the particular case . . . ."). Drommond has thus not met his burden of persuading us that he is entitled to relief under these provisions. *See id.* ¶¶ 12–13.

Drommond next contends that, even if there is no constitutional right to confrontation, the trial court erred by not properly evaluating whether the hearsay evidence was admissible under rule 403 of the Utah Rules of Evidence. But the Utah Rules of Evidence don't govern whether evidence is admissible in sentencing proceedings. UTAH R. EVID. 1101(c)(3). And whether evidence is admissible at a *capital* sentencing proceeding is governed by Utah Code section 76-3-207 and constitutional law. *See, e.g., State v. Maestas*, 2012 UT 46, ¶ 297, 299 P.3d 892 (holding that due process requires that "evidence presented in the penalty phase . . . be relevant and reliable"). Thus, the trial court didn't err when it didn't evaluate the admissibility of the evidence under rule 403.

unavailable to testify . . . and the opposing party had a prior opportunity to cross-examine." *State v. Timmerman*, 2009 UT 58, ¶ 9, 218 P.3d 590.

¶90 The issue here is whether the right to confrontation applies *at sentencing*. We first discuss federal case law on this issue. Although the United States Supreme Court has never addressed it, every circuit court of appeals has. We then discuss our own case law on the issue. It is inconsistent and, for that reason, does not clearly resolve the issue before us.

¶91 We begin with federal case law. Whether the Confrontation Clause applies at sentencing has gone unanswered by the U.S. Supreme Court.[9] But every federal circuit court of appeals has held that there is no right to confront witnesses at sentencing under the Sixth Amendment's Confrontation Clause.[10]

---

[9] The U.S. Supreme Court *has* held that defendants have no right to confront witnesses at sentencing proceedings—even at capital sentencing proceedings—under the Due Process Clause of the Fourteenth Amendment. *Williams v. New York*, 337 U.S. 241, 245 (1949) (affirming a sentencing procedure that allowed the sentencing judge to consider information about the defendant "even though [it was] obtained outside the courtroom from persons whom a defendant has not been permitted to confront or cross-examine"). The Court in *Williams* based its holding in part on its belief that a sentencing judge must have "the fullest information possible" about "the defendant's life and characteristics." *Id.* at 247. And the Court recognized "that most of the information now relied upon by judges to guide them in the intelligent imposition of sentences would be unavailable if information were restricted to that given in open court by witnesses subject to cross-examination." *Id.* at 250. In the end, however, *Williams* doesn't control the outcome of Drommond's Confrontation Clause challenge because it "is a due process, rather than Sixth Amendment, case." *United States v. Fields*, 483 F.3d 313, 327 (5th Cir. 2007). Indeed, the Confrontation Clause wasn't incorporated against the States by the Fourteenth Amendment's Due Process Clause until well after the *Williams* decision. *See Pointer v. Texas*, 380 U.S. 400 (1965).

[10] *See United States v. Zerpa-Ruiz*, 784 F. App'x 353, 356 (6th Cir. 2019); *United States v. Umaña*, 750 F.3d 320, 348 (4th Cir. 2014); *Muhammad v. Sec'y, Fla. Dep't of Corr.*, 733 F.3d 1065, 1076 (11th

(continued . . .)

So although there is no binding U.S. Supreme Court precedent, recent federal case law strongly suggests that the Confrontation Clause does not apply at sentencing.

¶92 Next, we put our own case law under the microscope. The Utah Supreme Court has applied both the state and federal right to confrontation at a sentencing proceeding. We did so in *State v. Carter*, 888 P.2d 629 (Utah 1995), *superseded on other grounds by* UTAH CODE § 76-3-207(2)(a)(iii) (1999).

¶93 There, the defendant challenged a statute as violating the right to confrontation under both the U.S. and Utah Constitutions. *Id.* at 641. The statute applied to capital resentencing proceedings. *Id.* It allowed all evidence properly admitted at trial and in previous sentencing proceedings—including all exhibits and a transcript of all testimony—to be admitted into evidence at the resentencing proceeding. *Id.* The defendant argued that the statute violated his right to confrontation. *Id.* In deciding the appeal, we didn't question whether the right to confrontation applies at sentencing; we took as a given that it does. *Id.* at 642 (determining that the capital resentencing statute implicated "a capital defendant's right to confrontation"). And we incorporated into the resentencing statute "the safeguards articulated by the United States Supreme Court in [*Ohio v. Roberts*, 448 U.S. 56, 66 (1980), *abrogated by Crawford v. Washington*, 541 U.S. 36 (2004)] and adopted by this court in [*State v. Brooks*, 638 P.2d 537, 539 (Utah 1981), *abrogated by constitutional amendment as stated in State v. Goins*, 2017 UT 61, ¶¶ 31–32, 45, 423 P.3d 1236]." *Id. Roberts* had held that an unavailable witness's hearsay statement could be admitted at *trial* under the Confrontation Clause only if the hearsay statement "bears adequate 'indicia of reliability,'" such as when it "falls within a firmly rooted hearsay exception."[11] 448

Cir. 2013); *United States v. Ghiassi*, 729 F.3d 690, 695–96 (7th Cir. 2013); *Fields*, 483 F.3d at 327; *United States v. Bras*, 483 F.3d 103, 109 (D.C. Cir. 2007); *United States v. Robinson*, 482 F.3d 244, 246 (3d Cir. 2007); *United States v. Bustamante*, 454 F.3d 1200, 1202 (10th Cir. 2006); *United States v. Littlesun*, 444 F.3d 1196, 1200 (9th Cir. 2006); *United States v. Brown*, 430 F.3d 942, 943–44 (8th Cir. 2005); *United States v. Luciano*, 414 F.3d 174, 179 (1st Cir. 2005); *United States v. Martinez*, 413 F.3d 239, 243 (2d Cir. 2005).

[11] The U.S. Supreme Court overruled the *Roberts* "indicia of reliability" test in *Crawford v. Washington* and instead held that an

(continued . . .)

U.S. at 66. In short, the *Carter* court applied article I, section 12 of the Utah Constitution and the Confrontation Clause of the U.S. Constitution without even questioning whether those provisions apply at sentencing. *See* 888 P.2d at 646.

¶94 We have found no Utah case that predates *Carter* that applied the constitutional right to confrontation (be it state or federal) at sentencing, and the parties haven't pointed us to one either. The only case within the same ballpark analyzed whether the defendant's right to *due process* was violated when the trial court relied on hearsay statements at sentencing and precluded the confrontation of certain witnesses at sentencing. *See State v. Sanwick*, 713 P.2d 707 (Utah 1986). There, we relied on an Idaho Supreme Court decision that held that "[h]earsay was admissible [at sentencing] as long as the defendant had the opportunity to rebut the adverse evidence and to challenge the reliability of the evidence presented." *Id.* at 709 (citing *State v. Johnson*, 618 P.2d 759 (1980)).

¶95 Nor have we consistently applied our *Carter* decision in later cases. For example, we implied in *State v. Kell*, that the right to confrontation applies at sentencing, but we didn't mention *Carter* in that context or its requirements that the hearsay declarant be unavailable and that the hearsay statement bear adequate indicia of reliability. 2002 UT 106, ¶¶ 43–44, 61 P.3d 1019. And later, in *Taylor v. State*, we held that the defendant's appellate counsel wasn't ineffective for failing to challenge the trial court's 1991 admission of hearsay evidence at sentencing. 2007 UT 12, ¶ 108, 156 P.3d 739. Citing *Carter* and *Sanwick*, we reasoned that when the defendant appealed in 1991, "hearsay evidence generally was considered to be admissible at sentencing" as long as the hearsay was "reliable" and the defendant was "given the opportunity to rebut the evidence." *Id.* In dicta, we said that the U.S. Supreme Court's *Crawford* opinion had "triggered some debate as to whether confrontation rights apply to sentencing." *Id.* ¶ 108 n.4. But because the issue wasn't determinative in that case, we didn't address it. *Id.*

¶96 Next, in *State v. Timmerman*, while analyzing whether one has a constitutional right to confrontation at preliminary hearings,

---

unavailable witness's hearsay statement can be admitted at trial only if it was previously "test[ed] in the crucible of cross-examination." 541 U.S. 36, 61 (2004).

we held that three U.S. Supreme Court cases "establish Supreme Court precedent *confining* the Sixth Amendment Confrontation Clause *to trial.*" 2009 UT 58, ¶ 11, 218 P.3d 590. (emphases added) (citing *Pennsylvania v. Ritchie,* 480 U.S. 39, 52 (1987) (plurality opinion); *California v. Green,* 399 U.S. 149, 157 (1970); *Barber v. Page,* 390 U.S. 719, 725 (1968)); *see also State v. Rhinehart*, 2006 UT App 517, ¶ 14, 153 P.3d 830 ("The Confrontation Clause pertains to a criminal defendant's right to confront and cross-examine the witnesses against the defendant *at trial . . . .*" (emphasis added)). And, we held, because the federal Confrontation Clause applies only at trial, it "does not apply to preliminary hearings." *Timmerman*, 2009 UT 58, ¶ 13. So if, as *Timmerman* held, the Confrontation Clause is confined to trial, then it wouldn't provide a right to confrontation at sentencing (assuming sentencing is not part of trial). *See United States v. Ray*, 578 F.3d 184, 196 (2d Cir. 2009) ("[W]e conclude that the word 'trial,' as understood at the time of the Founding, would not have encompassed sentencing proceedings."). *But see* John G. Douglass, *Confronting Death: Sixth Amendment Rights at Capital Sentencing*, 105 COLUM. L. REV. 1967, 1973 (2005) (concluding that, in 1791, "[t]here was no distinction between trial rights and sentencing rights because, in both purpose and effect, the trial was the sentencing").

¶97  And, most recently, we said in *State v. Maestas*, that "we have never analyzed whether a defendant in a penalty phase should be afforded the right to confront witnesses." 2012 UT 46, ¶ 297, 299 P.3d 892. We said so without citing *Sanwick*, *Carter*, *Kell*, *Taylor*, or *Timmerman*. *Id.* And we didn't decide whether the right applied at sentencing in *Maestas* because we held that any alleged error in that case was harmless. *Id.* ¶ 298.

¶98  Taken together, our case law is somewhat contradictory as to whether the constitutional right to confrontation applies at sentencing, and, if so, how that right is satisfied. All in all, the arc of both our case law and federal case law seems to bend away from applying the right to confrontation at sentencing. But this is not the case for us to decide this issue because, even assuming the right to confrontation does apply at sentencing (or at the very least, at capital sentencing), any error in Drommond's case was harmless beyond a reasonable doubt. *Kell*, 2002 UT 106, ¶ 54 (declining to reach constitutional questions when any potential error wasn't prejudicial). We look forward, however, to resolving this issue in a future case in which it is necessary to do so. *See, e.g.*, *State v. Argueta*, 2020 UT 41, ¶ 55, --- P.3d ---.

*B. Any Error Was Harmless Beyond a Reasonable Doubt*

¶99 The hearsay statements that Drommond complains of all came from Detective Kilpack's testimony: the Kilpack–Hansen Hearsay Testimony, the Kilpack–Buchanan Hearsay Testimony, and the Kilpack–Shakespeare Hearsay Testimony. *See supra* ¶¶ 24, 31–32. Neither Hansen, Buchanan, nor Shakespeare testified at the penalty-phase trial. The State contends that any error in allowing Detective Kilpack to testify about these witnesses' statements was harmless beyond a reasonable doubt. We first determine that Drommond did not preserve his objection to the Kilpack–Shakespeare Hearsay Testimony. We then hold that any constitutional error in admitting the Kilpack–Hansen Hearsay Testimony and the Kilpack–Buchanan Hearsay Testimony was indeed harmless beyond a reasonable doubt.

1. Preservation Issues

¶100 Drommond did not preserve his assertion that the Kilpack–Shakespeare Hearsay Testimony was improperly admitted into evidence. To preserve an issue for appeal, a party must raise a "timely and *specific* objection." *State v. Low*, 2008 UT 58, ¶ 17, 192 P.3d 867 (citation omitted). Only then will the alleged errors come "to the trial court's attention to give the court an opportunity to correct the errors if appropriate." *Id.* (citation omitted). And if "there is no clear or specific objection and the specific ground for objection is not clear from the context[,] the theory cannot be raised on appeal." *Id.* (alteration in original) (citation omitted).

¶101 Because Drommond didn't raise a timely and specific objection to the Kilpack–Shakespeare Hearsay Testimony, Drommond failed to preserve his argument that it was improperly admitted into evidence. In his argument before the penalty-phase trial for the right to confront witnesses, Drommond's counsel excluded Shakespeare: "There's one witness that's a cousin and her name is . . . Shakespeare. . . . She's clearly unavailable, so she's not going to fall within the confines of the argument I'm about to present to you." The trial court rejected counsel's request for the right to confrontation.

¶102 Then, just before Detective Kilpack testified, Drommond's counsel renewed his argument for the right to confront witnesses: "Just for the record, next witness you're going to have is a variety of statements, not all of them are going to be hearsay. But you'll know it when you [h]ear it. So, I would like to renew my objection with respect to confrontation." Drommond

now urges us that this statement was somehow an objection to the Kilpack–Shakespeare Hearsay Testimony. He says that this renewal "rectified" the earlier "waiver."

¶103 We disagree. Drommond didn't raise a timely and specific objection to the Kilpack–Shakespeare Hearsay Testimony. And the trial court never had the chance to rule on the admissibility of the testimony because counsel excluded testimony about Shakespeare's statements from the original objection. By simply renewing that original objection before Detective Kilpack testified, Drommond didn't object to the Kilpack–Shakespeare Hearsay Testimony. Because Drommond failed to object to the Kilpack–Shakespeare Hearsay Testimony, his challenge to that testimony on appeal is unpreserved.[12] The Kilpack–Shakespeare Hearsay Testimony was, on that basis, properly before the jury.

2. Any Error Was Harmless Beyond a Reasonable Doubt

¶104 We are left only with deciding whether the admission of the Kilpack–Hansen Hearsay Testimony and the Kilpack–Buchanan Hearsay Testimony was harmless beyond a reasonable doubt.

¶105 When an error amounts to a violation of a defendant's constitutional right to confrontation, "reversal is required unless the error is harmless beyond a reasonable doubt." *State v. Villarreal*, 889 P.2d 419, 425 (Utah 1995) (citation omitted). This harmless-beyond-a-reasonable-doubt analysis requires us to determine "the probable impact of the [testimony] on the minds of the average juror." *Id.* (citation omitted). We can evaluate several factors in deciding whether an error was harmless beyond a reasonable doubt, such as "the importance of the witness'[s] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence collaborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Id.* at 425–26 (citation omitted).

¶106 Two main pieces of evidence emerged from the Kilpack–Hansen Hearsay Testimony and the Kilpack–Buchanan Hearsay

---

[12] Drommond has not argued for an exception to our preservation rule.

Testimony. The first was that Drommond had asked Hansen to break into Reed's house and scare her out of getting married and to drive by the houses of Reed and her fiancé to record license plate numbers. The second was that Drommond had expressed his desire to kill other members of Reed's family and that he had no remorse about killing Reed.

¶107 Applying the harmless-beyond-a-reasonable-doubt standard to each piece of evidence, we find that it wouldn't likely impact the mind of the average juror because (1) the prosecution's case was strong and (2) other testimony corroborated this evidence.

¶108 First, "the overall strength of the prosecution's case," *id.* at 426 (citation omitted), supports our holding that Kilpack's testimony about the Hansen and Buchanan interviews was harmless beyond a reasonable doubt. The State presented potent evidence upon which the jury could have relied to sentence Drommond to life in prison without the possibility of parole. Specifically, the jury heard evidence that Drommond tucked a gun in his waistband before meeting his ex-wife, who was dropping their children off for visitation. It heard that—while his children were nearby—he shot her in the body from close range. Jurors also heard that he then walked closer to Reed and shot her in the head. It heard evidence that he then shot his former father-in-law and that he continued to fight those at the murder scene for possession of the gun. The jury also heard testimony that Drommond sent Reed threatening emails shortly before the murder.

¶109 Second, the Kilpack–Hansen Hearsay Testimony and the Kilpack–Buchanan Hearsay Testimony were corroborated by other evidence properly before the jury.

¶110 The Kilpack–Hansen Hearsay Testimony was corroborated by Carlson's testimony and by Kilpack's testimony about text messages he saw. For starters, Carlson testified that Drommond wanted to scare Reed out of dating or marrying other men. Carlson also testified that Drommond, two or three weeks before the murder, talked with him and Hansen about "breaking into [Reed's] house," and "like cutting the phone line kind of thing, and like scaring her, you know with fear, if you date him then bad things will happen to you." Carlson further explained that Drommond had Hansen drive by Reed's house "and kind of check it out" and said that he and Drommond had even gone to Reed's house to do so. On top of hearing Carlson's testimony, the

jury heard Kilpack testify that he saw text messages from Drommond that corroborated the Kilpack–Hansen Hearsay Testimony. One of the texts reminded Hansen that he had been "given $400 by Mr. Drommond for this particular situation and driving by the house." And so the Kilpack–Hansen Hearsay Testimony was corroborated by other evidence.

¶111 The Kilpack–Buchanan Hearsay Testimony—which went toward Drommond's lack of remorse and his desire to kill members of Reed's family—was likewise corroborated by other evidence. First, Kilpack testified that Shakespeare told him that Drommond told her after the murder that "he felt great because [Reed] was gone" and that "if he had the power to do so, he would kill the entire Bradley family." We held above that this testimony was properly before the jury because Drommond didn't object to it. *Supra* ¶ 103. It is thus proper for us to consider it in the harmless-beyond-a-reasonable-doubt analysis. Second, Carlson also testified that Drommond expressed no remorse for the murder and that it "almost kind of seemed like a joke that he was [in jail]." Thus the jury heard other evidence that Drommond wanted to have members of Reed's family killed and that he didn't regret murdering Reed.

¶112 Overall, the Kilpack–Hansen Hearsay Testimony and the Kilpack–Buchanan Hearsay Testimony were just two small pieces of the State's case. The substance of the interviews was corroborated by other evidence before the jury and the overall strength of the prosecution's case was strong. Any constitutional error in admitting the evidence would not affect the mind of the average juror and was therefore harmless beyond a reasonable doubt.

### III. VICTIM-IMPACT EVIDENCE

¶113 Drommond next maintains that certain victim-impact evidence violated his right to due process under the Utah Constitution.[13] This claim fails because most of the evidence that

---

[13] Drommond also claims the victim-impact evidence violated his right to due process under the United States Constitution. The Due Process Clause of the Fourteenth Amendment bars victim-impact evidence that "is so unduly prejudicial that it renders the trial fundamentally unfair." *Payne v. Tennessee*, 501 U.S. 808, 825

(continued . . .)

Drommond complains about is not victim-impact evidence. And the evidence that is victim-impact evidence wasn't prejudicial.

¶114 Utah Code section 76-3-207(2)(a)(iii) allows, during capital sentencing proceedings, the presentation of evidence about "the victim and the impact of the crime on the victim's family and community without comparison to other persons or victims." Victim-impact evidence is evidence that "speaks to the victim's character, effects of the crime on the surviving family, or any opinions of the surviving members about the crime." *See State v. Lafferty*, 2001 UT 19, ¶ 83, 20 P.3d 342. Evidence is not victim-impact evidence when it merely "portrays . . . what took place at the crime scene." *See id.*

¶115 Drommond characterizes evidence about the following as victim-impact evidence: the 1995 strangling, the 2005 strangling and the resulting protective order, Drommond's threatening emails to Reed, the "bounty hunter service," Drommond's requests that his friends break into Reed's house and scare her out of dating and getting remarried, the murder and the struggle to disarm and subdue Drommond, Drommond's lack of remorse, Drommond's postmurder statements that he wanted Reed's sister to be hurt or killed, Drommond's statements that he wanted to kill the entire Bradley family, Reed's autopsy, and the testimony of Reed's sister that Reed's children "miss their mother very much" and that "they don't understand what's happened."[14]

¶116 The only evidence here that is victim-impact evidence is the testimony about Reed's children missing their mother. That evidence speaks to the "effects of the crime on the surviving family." *Id.* The rest of the evidence is not victim-impact evidence,

(1991). Because the victim-impact evidence wasn't prejudicial, *infra* ¶¶ 117–21, it didn't violate the U.S. Constitution.

[14] Drommond also complains that the jury saw a photograph of Reed and her two children. When the State moved to admit the photograph at trial, Drommond's trial counsel said that he had no objection. And because Drommond's trial counsel didn't object, Drommond has lost the chance to argue on appeal that its admission was erroneous. *State v. Low*, 2008 UT 58, ¶ 17, 192 P.3d 867 (citation omitted) (holding that, to preserve an issue for appeal, a party must raise a "timely and specific objection" (emphasis omitted)).

however, because it does not go toward "the victim's character, effects of the crime on the surviving family, or any opinions of the surviving members about the crime." *Id.* It just describes the events before the crime, what took place at the crime scene, and Drommond's lack of remorse after the crime.

¶117 Because the other evidence is not victim-impact evidence, we need only determine whether the testimony about Reed's children missing their mother violated Drommond's right to due process under the Utah Constitution. Because Drommond has not shown that he was prejudiced by the victim-impact evidence, his claim fails.

¶118 We have never "addressed what limitations, if any, the state constitution places on the use of victim-impact evidence during the penalty phase of a capital trial."[15] *State v. Maestas*, 2012 UT 46, ¶ 307, 299 P.3d 892. That is because, "[b]efore treating the constitutional issue on its merits, we determine whether the victim impact evidence . . . was prejudicial." *State v. Kell*, 2002 UT 106, ¶ 52, 61 P.3d 1019 (footnote omitted). And if a "potential error is not prejudicial," we need not decide the constitutional limits on victim-impact evidence. *Id.* Following that logic in *Kell* and *Maestas*, we found a lack of prejudice and declined to reach the constitutional question. *Id.* ¶¶ 53–54; *Maestas*, 2012 UT 46, ¶ 317. Likewise, we do so today: Drommond has not shown that he was prejudiced by the testimony about the children missing their mother and so we do not address any constitutional limits on victim-impact evidence.

¶119 A defendant is prejudiced by an error if there is not "a mere possibility, but a reasonable likelihood that the error affected the result." *Maestas*, 2012 UT 46, ¶ 308 (citation omitted). When deciding "whether a defendant was prejudiced by the admission of victim-impact evidence, we consider the totality of the evidence before the jury." *Id.* (citation omitted) (internal quotation marks omitted). Prejudice is a high bar to meet; even "detailed

---

[15] This court has previously indicated, without deciding, that Utah Code section 76-3-207(2)(a)(iii) may violate the Utah Constitution. *State v. Ott*, 2010 UT 1, ¶ 24 n.3, 247 P.3d 344. The State asks us to "reconsider *Ott* because it incorrectly extended death-penalty victim-impact precedent to a non-death sentencing." We need not decide either of these issues today because the victim-impact evidence didn't prejudice Drommond.

descriptions" of victims' grief may be admissible. *Id.* Victim-impact evidence may be prejudicial, however, "if it is pervasive, if it contains an opinion of the defendant's character or the appropriate sentence, if it exceeds a description of the 'family's loss and mourning,' or if it fails to be 'moderate in tone.'" *Id.* (footnotes omitted) (citations omitted).

¶120 Drommond wasn't prejudiced by the testimony about the children missing their mother. In its entirety, the statement was this: "They of course miss their mother very much. And they don't understand what's happened. But they are good kids and I love them." As in *Maestas*, this statement was "moderate in tone," "not pervasive," and "did not express an opinion about [Drommond's] character or the appropriate sentence." *Id.* ¶ 313. Indeed, this victim-impact evidence was minimal. *See State v. Arguelles*, 2003 UT 1, ¶ 123, 63 P.3d 731 (holding that any error in admitting victim-impact evidence was harmless because it was "minimal"). And although even "vivid images of . . . grief . . . are not necessarily prejudicial," *Maestas*, 2012 UT 46, ¶ 316, this short, benign testimony was in not even vivid. It was just a quick description of the family's loss and mourning.

¶121 We thus hold that the admitted victim-impact evidence testimony didn't prejudice Drommond, and we decline to define the constitutional limits on victim-impact evidence.

## IV. FAILURE TO GIVE A JURY INSTRUCTION UNDER *LAFFERTY*

¶122 Drommond next protests the admission of evidence of his previous "uncharged crimes," arguing that it violated his rights under the United States Constitution—the right to due process and the right to be free from cruel and unusual punishment. He maintains that the jury should have received an instruction prohibiting it from considering those crimes unless the jury found that the crimes had been proven beyond a reasonable doubt.[16] The State contends that such an instruction is not

---

[16] Drommond also argues that the evidence of the "uncharged crimes" violated his state constitutional rights—his rights under article I, sections 7, 9, and 12. But Drommond has failed to carry his burden of persuasion on appeal for these arguments because they were inadequately briefed. *See Bank of Am. v. Adamson*, 2017 UT 2, ¶ 13, 391 P.3d 196. Drommond cites these constitutional

(continued . . .)

necessary because the evidence merely gave context to the crime for which Drommond had pleaded guilty, and wasn't evidence of unrelated, uncharged crimes. We agree with the State and hold that the trial court didn't abuse its discretion in refusing to give the jury instruction that Drommond advocates for.

¶123 Drommond objects specifically to evidence (1) that he asked Carlson to get him a gun so they could start a "bounty hunter service" and intimidate people who owed Drommond money; (2) that he, two or three weeks before the murder, wanted Carlson and Hansen to break into Reed's house and scare her out of dating another man; (3) that he, on the day before the homicide, asked Hansen to break into Reed's house and scare her into not getting married to her fiancé; and (4) that he told his cellmate, Buchanan, that he wanted Reed's sister to be severely hurt or killed "so that she could not take care of his children."

¶124 Utah's capital sentencing statute allows the admission of aggravating or mitigating evidence that enables the court or jury body to appropriately sentence a defendant. *See* UTAH CODE § 76-3-207(2)(a). That evidence includes "the nature and circumstances of the crime," the defendant's "character, background, history, and mental and physical condition," "the victim and the impact of the crime on the victim's family," and "any other facts in aggravation or mitigation of the penalty that the court considers relevant to the sentence." *Id.* This wide-ranging information allows the court or jury to sentence the defendant based on the defendant's history, character, "violent propensities and future dangerousness." *State v. Lafferty*, 749 P.2d 1239, 1259 (Utah 1988), *adhered to on reconsideration*, 776 P.2d 631 (Utah 1989), and *overruled on other grounds by Met v. State*, 2016 UT 51, ¶¶ 89–90, 388 P.3d 447.

¶125 Drommond correctly asserts that, before the jury can consider other criminal activity as an aggravating factor, the jury must first be "convinced beyond a reasonable doubt that the

provisions and a few cases but does not provide sufficient "development of that authority" or sufficient "reasoned analysis based on that authority." *Angilau v. Winder*, 2011 UT 13, ¶ 27, 248 P.3d 975 (citation omitted); *see also Smith v. Four Corners Mental Health Ctr., Inc.*, 2003 UT 23, ¶ 46, 70 P.3d 904 (declaring an appellant's brief inadequate when it "merely cite[d] a few cases" and "provide[d] very little analysis").

accused did commit the other crime." *Id.* at 1260. So "when the prosecution introduces evidence of aggravating factors in the form" of another crime that hasn't resulted in a conviction, "the sentencing jury must be instructed (i) as to the elements of the other crime regarding which the evidence was adduced and (ii) that it is not to consider evidence of that crime as an aggravating factor unless it first finds that the prosecution has proven all the elements of the crime beyond a reasonable doubt." *Id.*

¶126 The issue here, however, is whether the evidence that Drommond protests was used as evidence of other criminal activity and as an aggravating factor. We find that it wasn't. A beyond-a-reasonable-doubt instruction was thus unnecessary.

¶127 The facts of *Lafferty* illustrate that point. In *Lafferty*, the defendant was convicted of two counts of first-degree murder. *Id.* at 1241. During the penalty-phase trial, the State introduced evidence that the defendant "had assaulted several people in jail while he awaited his trial." *Id.* at 1258. On appeal, we held that the jury could not rely on the assaults as an aggravating factor for sentencing unless it was convinced that the defendant committed them. *Id.* at 1260.

¶128 *Lafferty* thus applies when the State uses evidence of other, unrelated criminal activity as "important information about the accused's violent propensities and future dangerousness" or as "evidence of a defendant's past criminal behavior so that the jury [can] have an accurate picture of the defendant's background, history, and character."[17] *State v. Maestas*, 2012 UT 46, ¶ 287, 299

---

[17] *See also Maestas*, 2012 UT 46, ¶¶ 1, 278–79 (applying *Lafferty* in a death-penalty case in which the defendant had been convicted of committing aggravated murder during an aggravated burglary and the State had introduced evidence that the defendant had committed previous aggravated burglaries that were not related to the crime for which the defendant was sentenced); *Arguelles*, 2003 UT 1, ¶¶ 1, 22, 111 (applying *Lafferty* in an aggravated murder case because the State presented evidence of the defendant's past crimes); *State v. Taylor*, 818 P.2d 1030, 1031–35 (Utah 1991) (applying *Lafferty* in a first-degree murder case in which the defendant had raped and killed a young girl and the State presented evidence that the defendant, as a juvenile, (1) had sexual intercourse with his younger sister against her will,

(continued . . .)

P.3d 892. No case has held, however, that *Lafferty* applies *any time* the jury hears evidence of conduct that could constitute other criminal activity. Context matters. "[E]vidence may be relevant in several different contexts." *State v. Carter*, 888 P.2d 629, 654 (Utah 1995), *superseded on other grounds by* UTAH CODE § 76-3-207(2)(a)(iii) (1999). Evidence may, for example, be relevant to whether one committed a crime unrelated to the one for which the person is being sentenced (and thus relevant to future dangerousness or propensity for criminal activity), but it may also be relevant as evidence showing the nature and circumstances of the crime for which the person is being sentenced. We hold that *Lafferty* applies to the former use but not to the latter. In other words, *Lafferty*'s beyond-a-reasonable-doubt standard does not apply when the State uses evidence merely to show the nature and circumstances of the crime for which the defendant is being sentenced—even if that evidence might be criminal activity in and of itself.

¶129 We must now determine whether *Lafferty*'s beyond-a-reasonable-doubt standard applies here. The State, at Drommond's penalty-phase trial, didn't argue that the above evidence was evidence of crimes distinct from the aggravated murder for which he was being sentenced. Neither did it argue that the above evidence supported a sentence of life without the possibility of parole. Rather, the State presented the evidence as part of the circumstances of the murder. The evidence showed what Drommond did before the murder and informed the jury about Drommond's lack of remorse afterward. It showed how he got the murder weapon and his fixation on Reed dating another

─────────────

(2) burglarized a home, and (3) sexually abused a six-year-old neighbor girl and evidence that the defendant, as an adult, (1) was convicted of burglary and carrying a concealed weapon and (2) molested young girls at a public swimming pool); *State v. Parsons*, 781 P.2d 1275, 1276, 1279, 1283 (Utah 1989) (applying *Lafferty* in a death-penalty case in which the defendant had been convicted of first-degree murder after stabbing his victim to death and the State introduced as evidence of aggravating circumstances that the defendant murdered the victim "as a person on parole who knowingly possessed or had a firearm under his control or custody" in violation of a Utah criminal statute).

man in the weeks preceding the murder. The evidence wasn't used to claim that Drommond had a history of criminal activity or that he had committed similar crimes and so had a propensity for violence; the evidence was entwined with the crime for which Drommond had pleaded guilty and merely informed the jury about "the nature and circumstances of the crime." *See* UTAH CODE § 76-3-207(2). The evidence thus wasn't "other . . . criminal activity" used "as an aggravating factor," *Lafferty*, 749 P.2d at 1260, in favor of a sentence of life without parole. So, *Lafferty* doesn't apply to the evidence, and the trial court didn't err by refusing to give the *Lafferty* beyond-a-reasonable-doubt instruction.[18]

¶130 In sum, the State didn't seek to prove that Drommond committed other crimes and to use those crimes as an aggravating factor. So the trial court didn't abuse its discretion by refusing to give a beyond-a-reasonable-doubt jury instruction under *Lafferty*.

## V. CUMULATIVE ERROR DOCTRINE

¶131 Drommond last maintains that he deserves a new penalty-phase trial under the cumulative error doctrine. But he has inadequately briefed this argument and has thus failed to carry his burden of persuasion on appeal.

¶132 Our opinion in *Bank of America v. Adamson*, straightened out our briefing requirements. 2017 UT 2, ¶ 11, 391 P.3d 196. We held there that we do not have "a bright-line rule determining when a brief is inadequate."[19] *Id.* ¶ 12. As a result, we now focus

---

[18] The State also argues that *Lafferty* does not apply because *Lafferty* was a death-penalty case, and Drommond's is not. We need not decide whether *Lafferty* applies to non-death-sentence-eligible cases because, even assuming it does, it does not apply to the evidence challenged here.

[19] We realize that the briefs for this appeal were filed in 2010 and so the parties didn't have the benefit of our opinion in *Bank of America*. But at that time, we routinely declined to address issues that were inadequately briefed. *See, e.g.*, *State v. Timmerman*, 2009 UT 58, ¶ 25 n.5, 218 P.3d 590 ("An issue is inadequately briefed if the argument merely contains bald citations to authority [without] development of that authority and reasoned analysis based on that authority." (alteration in original) (citation omitted) (internal quotation marks omitted)).

our analysis on whether Drommond has made a "sufficient argument for ruling in [his] favor" rather than "on whether there is a technical deficiency in [briefing] meriting a default." *Id.* (alteration in original). Under this analysis, a "party must cite the legal authority on which its argument is based and then provide reasoned analysis of how that authority should apply in the particular case, including citations to the record when appropriate." *Id.* ¶ 13; UTAH R. APP. P. 24(a)(8) ("The argument must explain, with reasoned analysis supported by citations to legal authority and the record, why the party should prevail on appeal.").

¶133 Drommond's argument is inadequately briefed because it does not meet rule 24(a)(8)'s standard. Drommond could win his appeal under the cumulative error doctrine "only if the cumulative effect of the several errors undermines our confidence . . . that a fair trial was had." *State v. Martinez-Castellanos*, 2018 UT 46, ¶ 39, 428 P.3d 1038 (alteration in original) (citation omitted). Yet Drommond didn't provide "reasoned analysis" in his briefs about whether the alleged errors had a cumulative effect and, if so, why the cumulative effect of the alleged errors should undermine our confidence that his penalty-phase trial was fair. In other words, he didn't analyze the facts through the lens of the cited law.

¶134 Drommond's argument, rather than containing "reasoned analysis" about the cumulative error doctrine, is conclusory. *See Conocophillips Co. v. Utah Dep't of Transp.*, 2017 UT App 68, ¶ 29, 397 P.3d 772 (rejecting an argument for cumulative error as inadequately briefed because it was "confined to a single conclusory sentence" in the party's opening brief). Indeed, the argument in his opening brief just lists the alleged errors and concludes that the "cumulative effect of these errors precluded Defendant from obtaining a fair trial and due process in violation of his federal and state constitutional rights." And the argument in his reply brief is no more detailed. It claims simply that "the cumulative effect of [the] errors magnifies the unfairness of the capital sentencing trial and requires reversal." This is not the type of "reasoned analysis" that our opinion in *Bank of America* contemplates.

¶135 Because Drommond has inadequately briefed his argument under the doctrine of cumulative error, he has failed to carry his burden of persuasion on appeal. *Bank of Am.*, 2017 UT 2, ¶ 12. ("[A]n appellant who fails to adequately brief an issue 'will

almost certainly fail to carry its burden of persuasion on appeal.'" (citation omitted)).

## CONCLUSION

¶136 Drommond is not entitled to a new penalty-phase trial. His sentence—life in prison without the possibility of parole— stands. We affirm.