2021 UT App 13

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
ALFONSO MARGO VALDEZ,
Appellant.

Opinion
No. 20181015-CA
Filed February 11, 2021

Second District Court, Ogden Department
The Honorable Joseph M. Bean
No. 171901990

Emily Adams, Cherise M. Bacalski, and
Freyja Johnson, Attorneys for Appellant

Sean D. Reyes and John J. Nielsen,
Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES GREGORY K. ORME and JILL M. POHLMAN concurred.

HARRIS, Judge:

¶1      A jury convicted Alfonso Margo Valdez of kidnapping, robbery, and aggravated assault, after his ex-girlfriend (Ex-Girlfriend) testified that he forced her into his car with a gun, threatened her, hit her with the gun, cut her face with a knife, and stole her purse and phone. Valdez appeals his convictions, claiming that the trial court incorrectly—and in violation of the Fifth Amendment to the United States Constitution—allowed the State to imply guilt from Valdez's refusal to provide the swipe code to unlock his cell phone. Valdez also asserts that his attorney rendered ineffective assistance and that the court improperly excluded a witness's testimony. We find merit in

Valdez's Fifth Amendment argument, reverse his convictions on that basis, and remand for further proceedings.

BACKGROUND[1]

¶2      Valdez and Ex-Girlfriend dated and cohabited for a time in 2017 and, as Ex-Girlfriend recounted it, their relationship was a volatile one. She described Valdez as accusatory and violent, sometimes hitting and choking her, other times confining her in a locked room and once beating her so severely that her injuries required hospitalization. After their relationship ended, Ex-Girlfriend moved out of Valdez's apartment, but Valdez continued to contact her via phone and text message. Ex-Girlfriend maintained that, after they parted ways, she largely tried to keep her distance from Valdez but acknowledged that she had willingly seen him "a couple times" after their breakup, but before the incident at issue here occurred.

¶3      About two months after their relationship ended, Valdez sent Ex-Girlfriend a text message telling her he had some mail to give her and asking her to meet him. Although Ex-Girlfriend had concerns about meeting Valdez, she thought it was "nice of him" to reach out for the purpose of passing along her mail, and she "had hope" that their meeting "would be decent." Ex-Girlfriend told Valdez to meet her early one morning near her workplace after she finished her night shift. When Valdez pulled up in an SUV, Ex-Girlfriend approached the passenger side of the vehicle. She later testified that when she leaned into the open passenger-side window to speak to Valdez, he pulled out a revolver and

---

1. "When reviewing a jury verdict, we examine the evidence and all reasonable inferences in a light most favorable to the verdict, reciting the facts accordingly." *State v. Painter*, 2014 UT App 272, ¶ 2, 339 P.3d 107 (quotation simplified).

told her to get in the car. Frightened, she complied, and Valdez began driving.

¶4　After Ex-Girlfriend got in the vehicle, Valdez told her "how stupid [she] was" for agreeing to meet him before saying, "I hope you have talked to your kids today, because you are not going to get away from me this time." Valdez also pulled out a twelve-inch knife, which he wedged, blade pointed upward, between Ex-Girlfriend and the vehicle's center console. Ex-Girlfriend testified that, as Valdez drove, he held the gun in his left hand, hit her in the head with it, and struck her "several times in the head and face" with his other hand. He also demanded that she give him her phone and purse, which she did, and that she take off her clothes, a demand she perceived as an attempt to prevent her from escaping. Other than beginning to unlace her shoes, she did not remove her clothing.

¶5　At one point, while the vehicle was stopped, Valdez dislodged the knife and ran it down Ex-Girlfriend's face, cutting her lip. Ex-Girlfriend testified that, soon thereafter, she went into "survival mode," and began attempting to get out of the vehicle, an endeavor Valdez impeded by putting his hand around her throat and holding on to her hair. Eventually, Ex-Girlfriend was able to spin out of Valdez's grip, open the car door, and exit the vehicle. She then ran toward nearby houses, first knocking on a door and receiving no answer, and then attempting to flag down a passing vehicle. Finally, Ex-Girlfriend noticed a woman (Witness) standing on a nearby front porch and made her way toward that house.

¶6　Ex-Girlfriend explained to Witness that she was trying to escape from Valdez, and that Valdez had a knife and a gun and was trying to kill her. Ex-Girlfriend did not mention any injuries, and Witness did not see any blood on Ex-Girlfriend. Witness called the police, and a detective (First Detective) soon arrived and took statements from both Witness and Ex-Girlfriend. Much of First Detective's encounter with Witness and Ex-Girlfriend

was recorded on First Detective's body camera. Witness told First Detective that she had seen Valdez's vehicle stop in front of her house, and she could tell that Valdez and Ex-Girlfriend were arguing but could not see a knife or gun. During her trial testimony, Witness described watching the vehicle drive a few houses down the street, and observing Ex-Girlfriend apparently trying to get out of the vehicle, with her legs hanging out of the car; from Witness's vantage point, it appeared that Valdez was attempting to prevent Ex-Girlfriend from leaving the vehicle. A few hours later, another detective (Second Detective) interviewed Ex-Girlfriend at the police station; this interaction was also recorded.

¶7     The next day, police arrested Valdez and seized, among other things, an Android phone discovered on his person at the time of his arrest. Police later obtained a warrant to search the phone, but were unable to access its contents because they did not know the code to unlock the phone, which in this case was a "swipe code," a "nine dot pattern." According to the officer assigned to try to access the phone's contents, this particular phone would "only allow so many attempts" to unlock it "before completely locking you out of the phone or wiping or resetting the device and losing all of the data." After obtaining a warrant to search the phone, officers asked Valdez "for his pass code" and explained that if he did not provide it then they would attempt "maneuver[s]" with the phone that could "destroy[]" it. An officer testified that Valdez "refused to give [him] the pass code and just told [him] to destroy the phone." Officers were ultimately unable to access the phone's contents.

¶8     After investigation, the State charged Valdez with aggravated assault, aggravated kidnapping, and aggravated robbery. The case first proceeded to a jury trial in August 2018, but the court declared a mistrial when the State's first witness— Ex-Girlfriend—told the jury, in contravention of a pretrial order, that Valdez had previously spent time in prison. About two months later, a new jury was empaneled and a second trial was

held; this trial spanned five trial days and included testimony from eleven witnesses.

¶9    In the second trial, the State called as its first witness First Detective, who gave a lengthy and detailed narrative account of his interaction with Ex-Girlfriend at Witness's house on the day of the incident. After First Detective offered his observations of Ex-Girlfriend's appearance—that she had a small cut on her top lip and a broken hair clip, but no other apparent injuries—the prosecutor asked him whether Ex-Girlfriend had "provide[d] any details about how [the] kidnapping had occurred." First Detective answered in the affirmative, and spent the next five transcript pages describing in narrative fashion what Ex-Girlfriend had said to him about her encounter with Valdez. As First Detective began to describe Ex-Girlfriend's account of how she escaped from Valdez's vehicle, Valdez's attorney lodged a hearsay objection, stating that First Detective's testimony may have "fit within an [exception] up until this point," but that his description of her escape from the vehicle was no longer "showing any effect on this officer and how he conducted the investigation." The court overruled the objection, explained to the jury that the testimony was admissible "under a hearsay exception where it tells us why the officer acted in his investigation the way he did," and instructed the jury that First Detective's testimony in this vein was not to be considered "for the truth of the matter asserted." First Detective then completed his narrative description of what Ex-Girlfriend had told him, taking another two pages of trial transcript to do so. First Detective also described his interaction with Witness, but in much less detail.

¶10   After First Detective's testimony, Witness and Ex-Girlfriend testified about the incident, as recounted above. The State also called two additional police officers, who—among other things—testified that police were never able to find Ex-

Girlfriend's phone or any knife, and located only a starter pistol,[2] but no actual handgun, during a search of Valdez's residence.

¶11 The State called Second Detective as its final witness. One of the other officers had already testified that police were unable to access the contents of Valdez's phone, but had not described Valdez's refusal to provide the swipe code. As Second Detective began describing Valdez's refusal, Valdez's attorney objected, asserting that Valdez had a "Fifth Amendment [r]ight" not to provide the swipe code, and that the State should not be able to present any evidence of Valdez's refusal to provide it. The court overruled the objection, and allowed Second Detective to inform the jury that Valdez "refused to [provide] the passcode and just told [Second Detective] to destroy the phone."

¶12 The State also asked Second Detective about interviewing Ex-Girlfriend at the police station, and it played for the jury a video recording of the entire interview. Second Detective testified, without objection, that he had received training on how to "detect deception" on the part of interviewees, and he explained that one of his techniques for detecting deception—and one that he used with Ex-Girlfriend in this case—was to ask the interviewee to tell his or her story in reverse. He explained: "If you can remember [your story] in reverse," then it is "most likely, in [my] experience and training, . . . the truth." And he further testified that, when he asked Ex-Girlfriend to give her account in reverse, she was able to do so in a "consistent" manner. On cross-examination, Second Detective acknowledged that, while it took Ex-Girlfriend forty-five minutes to tell her story chronologically, it took her only a minute or two to recap her account in reverse. Valdez's attorney then asked Second Detective whether that one-minute reverse recap was "sufficient

---

2. According to one of the testifying officers, a "starter pistol" is "a gun that shoots blanks" and is used to ceremonially mark the start of races; it is not capable of firing actual bullets.

for [him] to validate everything that [Ex-Girlfriend] said," and Second Detective responded in the affirmative.

¶13     On redirect examination, the State asked Second Detective if he expected the reverse telling to be as detailed as the original telling, and he explained that he did not. The State then asked him for his "assessment" of Ex-Girlfriend's testimony, and he stated that he "believe[d] she was telling [him] the truth," and that he reached that conclusion because her "story matched what she told [First Detective] on-scene," "matched what she told [W]itness," and "was consistent with" the account she gave in "reverse order." After a few more questions, the State finished its redirect examination, and the court—without being prompted—asked counsel to approach the bench. After a sidebar discussion, the court issued a "corrective instruction," explaining to the jury that evidentiary rules "bar[] the admission of . . . expert testimony as to the truthfulness of a witness on a particular occasion," and prevent one witness from "vouch[ing] for the credibility of another." The court struck Second Detective's testimony "as far as saying that [Second Detective] believed the alleged victim in this matter was telling the truth," and instructed the jury to "disregard . . . that specific part of [Second Detective's] testimony as far as his belief that [Ex-Girlfriend] was telling the truth." The court also later gave the jury a written instruction, stating as follows: "You are instructed to disregard the portion of the testimony of [Second Detective] that deals with his opinion of the truthfulness of the alleged victim in this case."

¶14     After the State rested, Valdez moved for a mistrial on the basis that Second Detective, in describing his interview of Valdez, testified that he had read Valdez his *Miranda*[3] rights and that Valdez had thereafter refused to answer further questions. The court denied the motion, but offered to give an instruction

---

3. *Miranda v. Arizona*, 384 U.S. 436 (1966).

informing the jury of a defendant's right to remain silent. Valdez's counsel then asked to "amend [his] motion to include . . . the statement of [Valdez] failing to comply with [the officers'] request to provide the code for the phone." After hearing argument from the State, the court stated that "the Fifth Amendment does not necessarily protect" refusing to "giv[e] a pass code to a phone," and that it was "inclined" to deny Valdez's motion. However, the court did not make a definitive ruling, stating that it would "give [the matter] some thought" and invite further discussion on the issue "when we do jury instructions." But neither the court nor the parties brought the matter up again, and the court never made a final ruling on Valdez's "amend[ed]" motion for mistrial.

¶15 Valdez then called several witnesses of his own, although he elected not to testify himself. The first was his ex-wife (Ex-Wife), who lived next door to Valdez, in the same duplex, and shared a wall with him. During her testimony, Ex-Wife testified that the apartment walls were thin, and she never heard screaming, yelling, or any signs of trouble coming from Valdez's apartment, even during the time that Ex-Girlfriend lived with Valdez; this testimony was corroborated by testimony from Valdez's daughter, who lived with Ex-Wife. Ex-Wife also characterized Ex-Girlfriend as a "guest that never left" and was "hard to get rid of." Ex-Wife was acquainted with Ex-Girlfriend not only because of their common association with Valdez, but also because she and Ex-Girlfriend worked for the same company. Ex-Wife testified that on the morning of the incident in question, while both of them were at work, Ex-Girlfriend had shown her a series of text messages between Valdez and herself that were "sexual" and appeared to indicate that the two of them wanted to "make[] up."

¶16 Valdez also attempted to call his aunt (Aunt) to the stand. Aunt was prepared to testify that—contrary to Ex-Girlfriend's assertions that she largely avoided Valdez after their breakup— Ex-Girlfriend had, in fact, often attempted to see Valdez in the

month leading up to the incident. Valdez proffered that Aunt could testify that, while Valdez was at Aunt's house performing odd jobs after he and Ex-Girlfriend had broken up, Aunt had seen Ex-Girlfriend parked outside of the house waiting for Valdez, and that Ex-Girlfriend had done this uninvited. Valdez's counsel argued that Aunt's testimony was admissible pursuant to rule 608(c) of the Utah Rules of Evidence "to establish a bias" and "to establish that there may be a motive [for Ex-Girlfriend] to misrepresent her testimony of how terrified that she was." Counsel made only the rule 608(c) argument, and did not assert that Aunt's testimony was admissible as ordinary impeachment evidence. The trial court refused to allow Aunt to testify, rejecting counsel's rule 608(c) argument.

¶17　After Valdez rested, the court instructed the jury. Valdez asked the court to provide instructions about lesser-included offenses regarding the aggravated kidnapping and aggravated robbery counts, but did not ask for a lesser-included-offense instruction with regard to the aggravated assault count. The court instructed the jury as Valdez requested.

¶18　During closing argument, the State emphasized (among other things) Valdez's refusal to disclose the swipe code to his phone, and did so in connection with an attempt to rebut Ex-Wife's testimony about the sexual text messages. Specifically, the prosecutor argued as follows:

> Now, you heard [Ex-Wife] say that she saw some texts. They were going to get back together and do sexual things. The State was very interested. You heard testimony from [several] witnesses about the efforts that were taken to get into [Valdez's] phone to determine what, if any, communication happened between the two of them. . . . The only way [the State] could get into that phone to see what these text messages said was by getting the

code from [Valdez]. And he chose to decline to do that.

. . . .

The [S]tate made and took a lot of effort to see what communications had gone on between them. Instead of providing any proof of text messages, they bring in . . . [Ex-Wife] to say that she, we didn't have a good relationship with [Ex-Girlfriend], happened to see the text between them was of a sexual nature. Think of the motive she had to lie. Her investment in this case. Ladies and gentlemen, use your common sense. Those texts [aren't[4]] here today.

¶19   At the conclusion of the trial, the jury convicted Valdez of aggravated assault, but declined to convict him of aggravated kidnapping and aggravated robbery, instead convicting him of lesser-included offenses, namely, kidnapping and robbery.

ISSUES AND STANDARDS OF REVIEW

¶20   Valdez now appeals, and asks us to consider several issues. We first address Valdez's assertion that his rights under the Fifth Amendment to the United States Constitution were violated when the trial court allowed Second Detective to testify about Valdez's refusal to provide the swipe code to his phone, and when the State argued therefrom that the jury should infer that there existed no "make up" texts between Valdez and Ex-Girlfriend. Because Valdez raises a constitutional claim, we

---

4. The record reads, "Those texts (inaudible) here today." From context, we infer that the inaudible phrase is "aren't."

review the trial court's conclusions for correctness. *State v. Maestas*, 2012 UT 46, ¶ 95, 299 P.3d 892.

¶21   In addition to his constitutional claim, Valdez raises several other issues. He claims that his attorney rendered constitutionally ineffective assistance of counsel in several respects, including when he (a) failed to object to Second Detective's testimony pertaining to the veracity of Ex-Girlfriend's statements, and (b) failed to object to the length and detail with which First Detective described the events leading to his investigation of the incident. And he claims that the trial court erred by refusing to allow Aunt to testify. Because we find merit in Valdez's Fifth Amendment argument and reverse on that ground, we need not reach the merits of these other arguments, although we provide some limited guidance in the hope it may be useful on remand.

ANALYSIS

I.

¶22   We first address Valdez's claim that his Fifth Amendment rights were violated when the State presented evidence that he refused to provide the swipe code to his cell phone, and then relied on that evidence in urging the jury to infer that there were no conciliatory and sexual text messages between Valdez and Ex-Girlfriend. We begin by engaging in a general discussion of governing Fifth Amendment legal principles. We then confront the particular question of whether communicating a cell phone swipe code to law enforcement is a "testimonial" act protected by the Fifth Amendment, and conclude that it is. Next, we analyze the applicability of the so-called "foregone conclusion exception" to testimoniality, and conclude that the exception does not apply in this case. We then determine that the State made more than an innocuous use of the evidence, and that the

Fifth Amendment was therefore violated in this case. Finally, we conclude that the error was not harmless.

A.      General Fifth Amendment Principles

¶23    The Self-Incrimination Clause of the Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself," and creates a privilege that protects a defendant "against being incriminated by his own compelled testimonial communications," *Doe v. United States*, 487 U.S. 201, 207 (1988). This privilege was created "to prevent the use of legal compulsion to extract from the accused a sworn communication of facts which would incriminate him," as had been done in historical "ecclesiastical courts and the Star Chamber," where inquisitors would "put[] the accused upon his oath and compel[] him to answer questions designed to uncover uncharged offenses, without evidence from another source." *Id.* at 212. The amendment "reflects a judgment that the prosecution should not be free to build up a criminal case, in whole or in part, with the assistance of enforced disclosures by the accused." *Id.* (quotation simplified); *see also Estelle v. Smith*, 451 U.S. 454, 462 (1981) (noting that the government is typically required to gather evidence through "the independent labor of its officers, not by the simple, cruel expedient of forcing it from [a suspect's] own lips" (quotation simplified)).

¶24    Many communications fall under the ambit of the Fifth Amendment's protection, *see State v. Gallup*, 2011 UT App 422, ¶ 14, 267 P.3d 289, but the Fifth Amendment does not protect defendants from disclosures of every kind, *see Doe*, 487 U.S. at 212. Rather, the amendment "protects a person only against being incriminated by his own compelled testimonial communications." *Id.* at 207 (quotation simplified). Thus, courts have often stated that communications merit Fifth Amendment protection only if they share three characteristics: (1) the communication is compelled, (2) the communication is

testimonial, and (3) the communication is incriminating. *See Hiibel v. Sixth Judicial Dist. Court*, 542 U.S. 177, 189 (2004) (stating that, in order for a communication to trigger Fifth Amendment protections, it "must be testimonial, incriminating, and compelled"); *see also Commonwealth v. Davis*, 220 A.3d 534, 543 (Pa. 2019) ("To invoke the Fifth Amendment privilege against the forced provision of information, a defendant must show (1) the evidence is self-incriminating; (2) the evidence is compelled; and (3) the evidence is testimonial in nature."), *cert. denied*, 141 S. Ct. 237 (2020).

¶25   In this case—as in several similar cases, *see, e.g.*, *Doe*, 487 U.S. at 207; *Davis*, 220 A.3d at 543—the elements of compulsion and incrimination are not contested. The State implied at trial that Valdez had an obligation to provide the swipe code to the investigating officers, and that he had no right to refuse. And it has "long been settled that [the Fifth Amendment's self-incrimination] protection encompasses compelled statements that lead to the discovery of incriminating evidence even though the statements themselves are not incriminating and are not introduced into evidence." *United States v. Hubbell*, 530 U.S. 27, 37 (2000); *see also id.* at 38 (stating that the Fifth Amendment protects "against the prosecutor's use of incriminating information derived directly or indirectly from the compelled testimony" of the defendant). Thus, even though the State might not have planned to introduce the actual swipe code into evidence, and even though the code was not itself evidence of a crime, that code could have led to the "discovery of incriminating evidence" on Valdez's phone, and therefore is properly categorized as at least indirectly "incriminating" for Fifth Amendment purposes. *See id.* at 37–38.

¶26   In this case, the only contested element is whether providing the swipe code to officers would have been "testimonial," as that term is used in the Fifth Amendment context. The State contends that it would not or, at least, that an exception to testimoniality applies here. Valdez, by contrast,

contends that any statement he might have made to police communicating the swipe code to them would have been testimonial in nature. We proceed to analyze these arguments.

B.     Testimoniality

¶27     "[I]n order to be testimonial, an accused's communication must itself, explicitly or implicitly, relate a factual assertion or disclose information." *Doe*, 487 U.S. at 210. The "touchstone" used to mark whether a communication "is testimonial is whether the government compels the individual to use 'the contents of his own mind' to explicitly or implicitly communicate some statement of fact." *See In re Grand Jury Subpoena Duces Tecum Dated March 25, 2011*, 670 F.3d 1335, 1345 (11th Cir. 2012) (quoting *Curcio v. United States*, 354 U.S. 118, 128 (1957)); *see also Doe*, 487 U.S. at 211 ("It is the extortion of information from the accused, the attempt to force him to disclose the contents of his own mind, that implicates the Self-Incrimination Clause." (quotation simplified)). "Whatever else it may include, the definition of 'testimonial' must encompass all responses to questions that, if asked of a sworn suspect during a criminal trial, could place the suspect in the cruel trilemma" of "self-accusation, perjury, or contempt." *See Pennsylvania v. Muniz*, 496 U.S. 582, 596–97 (1990) (quotation simplified).

¶28     "The most common form" of testimonial communication "is verbal or written communications—the vast amount of which will fall within the privilege" provided by the Fifth Amendment. *Eunjoo Seo v. State*, 148 N.E.3d 952, 955 (Ind. 2020). Indeed, the United States Supreme Court has made clear that "[t]here are very few instances in which a verbal statement, either oral or written, will not convey information or assert facts," and that therefore "[t]he vast majority of verbal statements thus will be testimonial." *See Doe*, 487 U.S. at 213.

¶29     On the other hand, citizens may be compelled to take various nonverbal actions without implicating the Fifth

Amendment's Self-Incrimination Clause. *See In re Grand Jury Subpoena*, 670 F.3d at 1345 (stating that "the Fifth Amendment privilege is not triggered where the Government merely compels some physical act, i.e. where the individual is not called upon to make use of the contents of his or her mind," and where the State's request amounts to something much more like a compelled hand-off of "the key to the lock of a strongbox containing documents"). For instance, "a suspect may be compelled to furnish a blood sample, to provide a handwriting exemplar or a voice exemplar, to stand in a lineup, and to wear particular clothing." *Doe*, 487 U.S. at 210 (quotation simplified); *see also Hubbell*, 530 U.S. at 35. In instances like these, the government does not seek access to a suspect's mind, and the suspect by undertaking the action is "not required to disclose any knowledge he might have, or to speak his guilt." *See Doe*, 487 U.S. at 211 (quotation simplified). Thus, nonverbal actions are often considered nontestimonial.

¶30 Likewise, "a person may be required to produce specific documents even though they contain incriminating assertions of fact or belief because the creation of those documents was not 'compelled' within the meaning of the [Fifth Amendment] privilege." *Hubbell*, 530 U.S. at 35–36; *see also id.* at 36 (stating that a person "could not avoid compliance with [a] subpoena served on him merely because the demanded documents contained incriminating evidence, whether written by others or voluntarily prepared by himself"). However, although voluntarily created documents are not themselves protected by the Fifth Amendment, its self-incrimination principles may be implicated when a suspect is asked to participate in the production of such documents, because "the act of production itself may implicitly communicate statements of fact" that the government may not already know, such as the fact that the documents "existed, were in his possession or control, and were authentic." *Id.* at 36 (quotation simplified); *see also Muniz*, 496 U.S. at 595 n.9 (explaining that "nonverbal conduct contains a testimonial component whenever the conduct reflects the actor's

communication of his thoughts to another"); *Fisher v. United States*, 425 U.S. 391, 410 (1976) (providing that the "act of producing evidence in response to a subpoena nevertheless has communicative aspects of its own, wholly aside from the contents of the papers produced").

¶31     In his noteworthy dissenting opinion in *Doe*, Justice Stevens offered an example of the difference between a verbal testimonial communication and a nonverbal nontestimonial action, stating that a person "may in some cases be forced to surrender a key to a strongbox containing incriminating documents," but that person cannot "be compelled to reveal the combination to his wall safe—by word or deed." *See* 487 U.S. at 219 (Stevens, J., dissenting). The majority opinion in *Doe* agreed with Justice Stevens's formulation, stating that it did "not disagree with the dissent that '[t]he expression of the contents of an individual's mind' is testimonial communication," but held that the act of "compulsion" at issue in that case "is more like 'being forced to surrender a key to a strongbox containing incriminating documents' than it is like 'being compelled to reveal the combination to [a] wall safe.'" *Id*. at 210 n.9 (majority opinion) (quoting *id.* at 219 (Stevens, J., dissenting)). And in *Hubbell*, in a majority opinion authored by Justice Stevens, the Supreme Court fully endorsed the combination safe/strongbox key distinction, holding that requiring a suspect to identify and assemble "the hundreds of documents responsive to the requests in [a] subpoena" was testimonial because it was "like telling an inquisitor the combination to a wall safe, not like being forced to surrender the key to a strongbox." *See Hubbell*, 530 U.S. at 43 (citing *Doe*, 487 U.S. at 210 n.9). Thus, according to the United States Supreme Court, a statement—by word or deed—communicating a combination to a wall safe is testimonial, but the act of handing over a key to a strongbox is nontestimonial. *See Davis*, 220 A.3d at 547 ("[T]he Supreme Court has made, and continues to make, a distinction between physical production and testimonial production.").

¶32    There are several ways in which law enforcement officers might go about gaining access to a suspect's locked cell phone, once a search warrant for that phone has been procured. Among them are these: (a) asking the suspect to communicate the access code to law enforcement officers, or (b) asking the suspect to personally unlock the phone, whether through biometric means (e.g., a fingerprint) or through entry of numbers or a swipe pattern, and then turn over the unlocked phone. In scenario (a), the suspect is asked to tell the officers what the code is, the officers learn that code, and may later enter the code into the phone themselves; in scenario (b), by contrast, the suspect is not asked to, and does not, communicate the code to law enforcement officers.

¶33    Scenario (a) is very much akin to revealing the combination to a wall safe, and is dissimilar from surrendering the key to a strongbox. *See Hubbell*, 530 U.S. at 43; *Doe*, 487 U.S. at 210 n.9. Indeed, while we are aware of no Utah law on this topic, various courts and commentators have recognized that, by asking a suspect to—orally or in writing—communicate the actual passcode to a cell phone, law enforcement officers seek a response that is testimonial in ways that simply turning over an unlocked phone is not, because such a request asks for the code itself. *See, e.g., Davis*, 220 A.3d at 548 (explaining that "the revealing of a computer password is a verbal communication, not merely a physical act that would be nontestimonial in nature," and that "one cannot reveal a passcode without revealing the contents of one's mind"); *United States v. Kirschner*, 823 F. Supp. 2d 665, 669 (E.D. Mich. 2010) (noting that "forcing [a defendant] to reveal the password for the computer communicates that factual assertion to the government, and thus, is testimonial—it requires [a defendant] to communicate 'knowledge,' unlike the production of a handwriting sample or a voice exemplar" (quoting *Doe*, 487 U.S. at 217)); *see also United States v. Spencer*, No. 17-CR-00259-CRB-1, 2018 WL 1964588, at *2 (N.D. Cal. Apr. 26, 2018) (stating that "the government could not compel [the defendant] to state the password itself, whether

orally or in writing," but holding, on the facts of that case, that it could compel the defendant to unlock the phone); *State v. Pittman*, --- P.3d ----, 367 Or. 498, 510 (2021) (stating that "[t]he state could not compel defendant to reveal the passcode to the phone" because "[r]equiring her to do so would compel her to make an express verbal or written statement"); Laurent Sacharoff, *What Am I Really Saying When I Open My Smartphone? A Response to Orin S. Kerr*, 97 Tex. L. Rev. Online 63, 68 (2019) (debating whether the government can compel a suspect to turn over an unlocked phone, and not "whether the government can compel a suspect to orally state, or write down, her passcode," because "[s]uch compulsion would violate the Fifth Amendment, as almost everyone including Kerr agrees"); Wayne R. LaFave et al., 3 *Criminal Procedure* § 8.13(a) (4th ed. 2020) (stating that "requir[ing] the subpoenaed party to reveal a passcode that would allow [the government] to perform the decryption . . . would require a testimonial communication standing apart from the act of production").

¶34    In this case, Second Detective testified that he explained to Valdez that he "had a search warrant" for the phone and that he "was asking for [Valdez's] pass code," and that Valdez responded by "refus[ing] to give [Second Detective] the pass code." We acknowledge that, during trial, Second Detective was not directly queried about whether he asked Valdez to provide the government with the swipe code, or whether he merely asked Valdez to input the swipe code himself and hand over the unlocked phone; we also acknowledge that Second Detective did not specify whether he asked Valdez to provide the swipe code via verbal description or by writing it down on paper. Nevertheless, we think the best reading of the record is that Second Detective asked Valdez to tell him, by word or deed, what the swipe code was. Second Detective stated that he "asked for" the passcode, and that Valdez refused "to give [him] the pass code." We therefore proceed with the understanding that scenario (a), above, applies here: that the government asked

Valdez to provide the swipe code itself, and did not merely ask that Valdez unlock and then hand over his phone.[5]

¶35    By making such a request, Second Detective asked Valdez to make an affirmative verbal statement, whether orally or in writing, that would have unquestionably been testimonial. To put it in Justice Stevens's terms, the government was asking Valdez to provide the equivalent of "the combination to [his] wall safe," a request that asked Valdez to reveal to the government the "contents of his own mind." *See Doe*, 487 U.S. at 210 n.9, 211 (quotation simplified). This "verbal statement," whether it took oral or written form, would have "convey[ed] information or assert[ed] facts" to the State that it could have used to further its investigation and prosecution of Valdez. *Id.* at 213 ("The vast majority of verbal statements thus will be testimonial and, to that extent at least, will fall within the [Fifth Amendment's] privilege."); *see also Davis*, 220 A.3d at 548. Accordingly, the request the State made of Valdez asked for a response that would have been testimonial in nature.

C.    The Foregone Conclusion Exception

¶36    The State does not strenuously resist the conclusion that the statement Valdez was asked to make was, at least to some degree, testimonial. Instead, it asserts that, even if the requested statement could be considered to have testimonial aspects, Fifth Amendment protections do not apply; the State contends that the statement Valdez was asked to make had "minimal testimonial significance" because the things the statement would have revealed were "foregone conclusions." Stated another way, the State, citing *Fisher*, 425 U.S. at 410–13, invokes what it refers

---

5. Because the facts of this case fall within scenario (a), we apply the law to those facts, and express no opinion as to the outcome of a case that might later arise under scenario (b).

to as the "foregone conclusion exception" to testimoniality. In our view, the State misperceives the reach of this exception.

¶37    In *Fisher*, the Supreme Court was not concerned with a verbal communication. *Id.* at 409 (analyzing the testimoniality of the act of responding to "a documentary summons"). As noted, verbal statements almost always "convey information or assert facts" and are nearly always "testimonial." *See Doe*, 487 U.S. at 213. But when the communication in question is the act of producing documents or other tangible goods, the question of testimoniality becomes much closer. *See Fisher*, 425 U.S. at 410–13. As the *Fisher* court noted, even an act of production might have "communicative aspects of its own, wholly aside from the contents of the papers produced," such as, for instance, conceding "the existence of the papers demanded and their possession or control by" the subpoenaed party. *Id.* at 410.

¶38    But on the facts of *Fisher*, the Court determined that the communicative aspects of the act of production required of the subpoenaed party were too insignificant to warrant Fifth Amendment protection. In reaching that conclusion, the Court noted that, while the party's act of producing the documents would reveal the existence of the documents as well as the fact that copies of them were in the party's custody, those pieces of information were "a foregone conclusion and . . . add[ed] little or nothing to the sum total of the [g]overnment's information." *Id.* at 411. In *Fisher*, the government already knew exactly which documents it was seeking, and it already knew that the subpoenaed party possessed them. *Id.* at 393–94. Thus, the party's act of producing the documents would reveal nothing to the government that it did not already know, and therefore the Court held that the party's "Fifth Amendment privilege [was] not violated because nothing [the party] has said or done is deemed to be sufficiently testimonial." *Id.* at 411.

¶39    After *Fisher*, the Supreme Court has mentioned the foregone conclusion exception only once more, in *Hubbell*, again

in the context of assessing the testimoniality of an act of producing documents. *See* 530 U.S. at 43–45. This time, the Court found the concept inapplicable, stating that "[w]hatever the scope of this 'foregone conclusion' rationale, the facts of this case plainly fall outside of it," because the government had "not shown that it had any prior knowledge of either the existence or the whereabouts" of the documents it sought. *Id.* at 44–45.

¶40    Since *Hubbell*, lower courts have taken various approaches in their application of the foregone conclusion exception. Some courts and commentators have been reluctant to expand the scope of the exception, given the Supreme Court's own apparent view that the exception is limited. *See, e.g.*, *Garcia v. State*, 302 So. 3d 1051, 1056–57 (Fla. Dist. Ct. App. 2020), *review granted*, No. SC20-1419, 2020 WL 7230441 (Fla. Dec. 8, 2020); *G.A.Q.L. v. State*, 257 So. 3d 1058, 1065–66 (Fla. Dist. Ct. App. 2018) (Kuntz, J., concurring); *State v. Andrews*, 234 A.3d 1254, 1287–88 (N.J. 2020) (LaVecchia, J., dissenting), *petition for cert. filed*, No. 20-937 (Jan. 7, 2021); *Davis*, 220 A.3d at 548–49; *see also* LaFave, 3 *Criminal Procedure* § 8.13(a) (stating that "requir[ing] the subpoenaed party to reveal a passcode that would allow [the government] to perform the decryption . . . would require a testimonial communication standing apart from the act of production, and therefore make unavailable the foregone conclusion doctrine"). These authorities emphasize the fact that, in both *Fisher* and *Hubbell*—the only times the Supreme Court has mentioned the foregone conclusion exception—the Court was analyzing the testimoniality of an act of production of documents, and not the testimoniality of a verbal statement. In *Davis*, for instance, the Pennsylvania Supreme Court described the "foregone conclusion gloss on a Fifth Amendment analysis" as "an extremely limited exception" to Fifth Amendment self-incrimination principles, and noted that the Supreme Court had "never applied or considered the foregone conclusion exception" outside the context of analyzing the testimoniality of the act of producing "business and financial records." *See* 220 A.3d at 549; *see also G.A.Q.L.*, 257 So. 3d at 1066 (Kuntz, J., concurring) (noting

that "[t]he foregone conclusion exception has not been applied to oral testimony," and viewing the exception as "inapplicable to the compelled oral testimony sought in this case"); *Andrews*, 234 A.3d at 1287–88 (LaVecchia, J., dissenting) (disagreeing with an approach that would "expansively apply" the foregone conclusion cases "to force disclosure of the contents of one's mind," and instead urging the court to "adhere to the [Supreme] Court's bright line: [that] the contents of one's mind are not available for use by the government in its effort to prosecute an individual"). According to these authorities, the foregone conclusion concept simply does not apply when assessing the testimoniality of a verbal communication, such as a statement conveying a cell phone passcode to the government.

¶41    Other courts and commentators have taken a different approach, and have proceeded to analyze, on the merits, the applicability of the foregone conclusion exception to situations in which a suspect is forced to disclose the passcode to a cell phone. *See, e.g.*, *Andrews*, 234 A.3d at 1273 (referring to a statement communicating a passcode as "a testimonial act of production," and proceeding to analyze, on the merits, whether the foregone conclusion exception applied to the facts of the case); *Davis*, 220 A.3d at 553–57 (Baer, J., dissenting) (referring to "the compulsion of [the suspect's] password" as "an act of production," and urging the court to conclude that "the foregone conclusion exception may potentially apply to cases involving the compelled disclosure of a computer password"). These authorities appear to recognize that the foregone conclusion exception has been applied by the Supreme Court only in the context of analyzing the testimoniality of acts of production of documents, but they nevertheless conclude that the act of communicating one's passcode to the government falls into the category of an "act of production."

¶42    We find the more limited approach to be more consistent with governing, binding case law. No Utah appellate court has considered the reach of the foregone conclusion exception. And

because the exception is a Fifth Amendment construct, the cases from the United States Supreme Court—the last word as to the meaning and scope of the federal constitution—are binding. That Court, as noted, has not mentioned the foregone conclusion exception in over two decades, when the Court referred to it simply as "this 'foregone conclusion' rationale," and noted that "whatever [its] scope . . . , the facts of this case plainly fall outside of it." *See Hubbell*, 530 U.S. at 44. The Court has never applied the exception outside of the context of assessing the testimoniality of a nonverbal act of producing documents. *See id.*; *see also Fisher*, 425 U.S. at 411–12. Yet the Court's instruction regarding the testimoniality of verbal statements, as well as the strongbox key/safe combination illustration, appear to be as robust as ever. *See, e.g., Davis*, 220 A.3d at 547–49 (describing the strongbox key example from *Doe*, and concluding that "prohibition of application of the foregone conclusion rationale to areas of compulsion of one's mental processes" as opposed to acts of production "would be entirely consistent with the Supreme Court decisions, surveyed above, which uniformly protect information arrived at as a result of using one's mind").

¶43 Moreover, given the vintage of the foregone conclusion cases, and the fact that the Supreme Court issued *Fisher* decades before cell phones were in widespread use, we have our doubts about whether the Supreme Court would extend the foregone conclusion concept to verbal statements that convey to the government the passcode to a modern cell phone. Such devices "could just as easily be called cameras, video players, rolodexes, calendars, tape recorders, libraries, diaries, albums, televisions, maps, or newspapers." *Riley v. California*, 573 U.S. 373, 393 (2014); *see also United States v. Djibo*, 151 F. Supp. 3d 297, 310 (E.D.N.Y. 2015) (noting that a modern smartphone can contain, in digital form, the "combined footprint of what has been occurring socially, economically, personally, psychologically, spiritually, and sometimes even sexually, in the owner's life"). And in a pair of recent cases, the Supreme Court has expressed hesitancy in applying analog-era legal rules to our fast-paced

cell-phone-centric digital world. *See, e.g., Carpenter v. United States*, 138 S. Ct. 2206, 2222 (2018) (noting that when "confronting new concerns wrought by digital technology," the Court "has been careful not to uncritically extend existing precedents," and in that case refusing to extend the "third-party doctrine" to "cell-site location information"); *Riley*, 573 U.S. at 401–02 (refusing to extend the search-incident-to-arrest exception to the warrant requirement to cell phones found on arrestees); *see also Eunjoo Seo v. State*, 148 N.E.3d 952, 961–62 (Ind. 2020) (determining that the foregone conclusion exception did not apply to the facts of the case, in part because of doubt about whether the Supreme Court, in light of *Carpenter* and *Riley*, would extend the exception to apply to modern cell phones).

¶44    Accordingly, we conclude that the foregone conclusion exception has no potential application here, where Valdez was asked to provide his swipe code to Second Detective, and was not merely asked to turn over an unlocked phone.[6] Valdez's

---

6. Even if we were to conclude that the foregone conclusion exception could apply to verbal statements, or that Valdez's statement was an act of production to which the exception could conceivably apply, it would not necessarily follow that the facts of this case fit within the exception's ambit. Courts and commentators are deeply split about which conclusions must be clear and foregone in order for the exception to apply. Some have concluded that the exception applies only if the government can show that it already knew, prior to requesting access to the cell phone, exactly which limited set of documents it was seeking and that those documents were to be found on the phone. *See, e.g., In re Grand Jury Subpoena Duces Tecum Dated March 25, 2011*, 670 F.3d 1335, 1346 (11th Cir. 2012) (concluding that the foregone conclusion exception did not apply where the government could not show that it knew "whether any files exist and are located on the hard drives"); *People v. Spicer*, 125 N.E.3d 1286, 1291 (Ill. App. Ct. 2019) ("We consider that the proper

(continued…)

(…continued)

focus is not on the passcode but on the information the passcode protects."); *Eunjoo Seo v. State*, 148 N.E.3d 952, 957–58 (Ind. 2020) (holding that, "unless the State can show it already knows" not only that "the suspect knows the password" but also that "the files on the device exist" and that "the suspect possessed those files," then "the communicative aspects of the production fall within the Fifth Amendment's protection"); Laurent Sacharoff, *What Am I Really Saying When I Open My Smartphone? A Response to Orin S. Kerr*, 97 Tex. L. Rev. Online 63, 68 (2019) (arguing that "[e]ntering the password to open the device is analogous to the physical act of handing over the papers" and that, therefore, "the foregone conclusion doctrine should apply to the files on the device" if the government can "show it already knows they exist and the defendant possesses them"). Others have concluded that, in order to avail itself of the exception, the government need demonstrate only that it already knew that the suspect knows the password. *See, e.g.*, *State v. Andrews*, 234 A.3d 1254, 1273 (N.J. 2020) (concluding that "the foregone conclusion test applies to the production of the passcodes themselves, rather than to the phones' contents), *petition for cert. filed*, No. 20-937 (Jan. 7, 2021); *State v. Pittman*, --- P.3d ----, 367 Or. 498, 526–27 (2021) (concluding that "[t]he testimonial information that the act [of production] communicates . . . does not include information about the phone's content," and "what the state must demonstrate it already knows" is merely that "the defendant knows the phone's passcode"); Orin S. Kerr, *Compelled Decryption and the Privilege Against Self-Incrimination*, 97 Tex. L. Rev. 767, 783 (2018) (opining that "when investigators present a suspect with a password prompt, and they obtain an order compelling the suspect to enter in the correct password, the suspect cannot have a valid Fifth Amendment privilege if the government independently can show that the suspect knows the password"). But because Valdez was asked to provide the actual swipe code and was not merely asked to provide an unlocked

(continued…)

verbal response—whether oral or written—to Second Detective's request would have been testimonial in nature, in that it would have conveyed to the government information contained in Valdez's mind, namely, the pattern of his swipe code. And as already stated, it is not contested here that the statement may have been at least indirectly incriminating, and that the State implied at trial that Valdez had an obligation to provide the swipe code. Thus, all three prerequisites for Fifth Amendment protection are present here: compulsion, testimoniality, and self-incrimination.

D.     The State's Use of the Evidence

¶45    "The mere mention" of a defendant's decision to remain silent, however, does not violate that defendant's constitutional rights. *State v. Saenz*, 2016 UT App 69, ¶ 10, 370 P.3d 1278 (quotation simplified). Instead, what the Fifth Amendment forbids is "either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Griffin v. California*, 380 U.S. 609, 615 (1965). That is, in order for Valdez's constitutional rights to have been violated in this instance, the State must have used Valdez's silence to "undermine the exercise of those rights guaranteed" by the Constitution. *See Saenz*, 2016 UT App 69, ¶ 10 (quotation simplified). Indeed, as we have previously recognized, "the evil to be avoided in this context" is not the mere mention of a defendant's invocation of the right to remain silent but, rather, "the implication that such silence is evidence of guilt." *Id.*

_____

(…continued)

phone, and because we have determined that the exception cannot apply to verbal statements seeking the contents of one's mind, we need not—and unlike some other courts, *see Commonwealth v. Davis*, 220 A.3d 534, 550 n.9 (Pa. 2019), *cert. denied*, 141 S. Ct. 237 (2020), we elect not to—take a position on the further applicability of the exception to the facts of this case.

(quotation simplified). The trial court did not discuss this next analytical step; indeed, its decision to allow Second Detective to testify about Valdez's refusal to provide the passcode appears to have been based on a belief that such refusal is not protected by the Fifth Amendment at all. If a statement (or refusal to make a statement) does not enjoy Fifth Amendment protection, the prosecution can use the statement or refusal to imply guilt without offending the Fifth Amendment, and in such cases the court need not in this context analyze the uses to which the prosecution puts such evidence. However, because we have determined that Valdez's refusal to provide the passcode does enjoy Fifth Amendment protection, we must proceed to assess whether the State used that evidence to imply Valdez's guilt.

¶46    Here, the State did more than merely mention Valdez's refusal to provide the swipe code. One of Valdez's main defenses was his claim—supported by Ex-Wife's trial testimony—that his encounter with Ex-Girlfriend had been friendly rather than adversarial, and had been preceded by a sexually charged text message exchange discussing reconciliation. During its closing argument, the State attempted to rebut this defense by pointing out that no such text messages were in evidence, and by urging the jury to disbelieve Ex-Wife's account of the text messages she claimed to have seen. In so doing, the State described the "efforts that were taken to get into [Valdez's] phone to determine what, if any, communication happened between" him and Ex-Girlfriend, and noted that Valdez had been given an opportunity to allow officers to access his cell phone—on which such messages could presumably be found—and that he "chose to decline to" provide the passcode.[7]

---

7. At oral argument, the State asserted that, even if it was not permitted to comment on Valdez's silence, it was permitted to emphasize Valdez's additional statement that officers should "destroy the phone." On the record before us, we disagree. As an

(continued…)

¶47　In its closing narrative, the State quite clearly invited the jury to draw an inference of guilt from Valdez's silence. And even "[i]ndirect references to a defendant's failure to testify are constitutionally impermissible if the comments were manifestly intended to be or were of such a character that the jury would naturally and necessarily construe them to be a comment on the defendant's failure to testify." *State v. Tillman*, 750 P.2d 546, 554 (Utah 1987). In this vein, the Utah Supreme Court has declared that "a prosecutor commits constitutional error" by making a statement that is "of such character that a jury would naturally and necessarily construe it to amount to a comment on the failure of the accused" to speak. *State v. Nelson-Waggoner*, 2004 UT 29, ¶ 31, 94 P.3d 186 (quotation simplified).

¶48　In sum, Valdez had a Fifth Amendment right to refuse to provide the swipe code to investigating officers, and during trial the State invited the jury to draw an inference of guilt from Valdez's silence. This action was no "mere mention" of Valdez's decision to withhold the swipe code. *See Saenz*, 2016 UT App 69, ¶ 10 (quotation simplified). In this context, the State's evidentiary use of Valdez's refusal to provide the swipe code violated Valdez's rights under the Fifth Amendment, and the trial court erred by allowing such evidence to come in and by allowing the State to use it in this manner.

---

(…continued)
initial matter, Valdez's statement about destroying the phone was made in connection with stating his refusal to provide the passcode, and therefore commentary about Valdez's statement about destroying the phone would have necessarily implicated Valdez's exercise of his right to silence. And in any event, the State in closing argument did not emphasize Valdez's statement about destroying the phone; instead, it emphasized Valdez's choice to decline to provide officers the passcode.

E.     Harmless Error

¶49     But not "all federal constitutional errors, regardless of their nature or the circumstances of the case, require reversal of a judgment of conviction." *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986). And "in the context of a particular case, certain constitutional errors, no less than other errors, may have been 'harmless.'" *Id.* However, when the error in question is "constitutional in nature, . . . its harmlessness is to be judged by a higher standard." *See State v. Villarreal*, 889 P.2d 419, 425 (Utah 1995) (quotation simplified). Under that higher standard, "reversal is required unless the error is harmless beyond a reasonable doubt," *State v. Drommond*, 2020 UT 50, ¶ 105, 469 P.3d 1056 (quotation simplified), and—at least for preserved claims of constitutional error—"the burden to demonstrate harm [or lack thereof] . . . shifts from the defendant to the State when a constitutional error is alleged," *see State v. Bond*, 2015 UT 88, ¶ 37, 361 P.3d 104; *see also Chapman v. California*, 386 U.S. 18, 24 (1967) (stating that "constitutional error . . . casts on someone other than the person prejudiced by it a burden to show that it was harmless").

¶50     Under this harmless error standard, we must attempt to "determine the probable impact of the testimony on the minds of the average juror." *Drommond*, 2020 UT 50, ¶ 105 (quotation simplified). In undertaking this inquiry, we "evaluate several factors," including "the importance of the witness's testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence collaborating or contradicting the testimony of the witness on material points, the extent of cross-examination permitted, and, of course, the overall strength of the prosecution's case." *Id.* (quotation simplified). If we "may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt," then the conviction will be affirmed despite the error. *See State v. Maestas*, 2012 UT 46, ¶ 56, 299 P.3d 892 (quotation simplified). On the other hand, "we cannot declare federal constitutional

error harmless unless we sincerely believe that it was harmless beyond a reasonable doubt." *See State v. Genovesi*, 909 P.2d 916, 922 (Utah Ct. App. 1995) (quotation simplified); *see also Drommond*, 2020 UT 50, ¶ 105 (stating that "reversal is required unless the error is harmless beyond a reasonable doubt" (quotation simplified)).

¶51 Under the circumstances presented here, the State has not carried its burden of demonstrating that its improper use of evidence that Valdez refused to provide his swipe code was harmless beyond a reasonable doubt. Valdez's chief defense to the charges was that the entire encounter with Ex-Girlfriend had not been a kidnapping or an assault, but instead had been voluntary on her part, and even a mutual effort toward reconciliation. And Ex-Wife's testimony describing sexually charged text messages between Ex-Girlfriend and Valdez on the morning of the incident was an important part of Valdez's defense. Indeed, the State recognized the importance of Ex-Wife's testimony by discussing it—and attempting to rebut it—during closing argument by arguing that Valdez's refusal to provide the swipe code indicated that no such text messages existed. *See State v. Ellis*, 2018 UT 2, ¶ 43, 417 P.3d 86 (stating that one factor leading to the conclusion that the admission of the evidence was not harmless was that "[t]he prosecution emphasized [it] during closing argument").

¶52 And while the prosecution's case was certainly supported by some persuasive evidence, we do not consider its case to have been so overwhelming as to render the error harmless beyond a reasonable doubt. Ex-Girlfriend's testimony was corroborated, in part, by Witness's account, especially Witness's perception that Valdez had been attempting to prevent Ex-Girlfriend from leaving the vehicle. But other portions of Ex-Girlfriend's testimony were unsupported by other evidence. Indeed, the physical evidence pointed to a more minor altercation than the one Ex-Girlfriend reported. Ex-Girlfriend had a broken hair clip and a small cut on her lip, but no other signs of injury.

Additionally, officers never found Ex-Girlfriend's phone, an actual handgun, or any knife, and Witness did not see a knife or a gun or any assault in her observations of the incident.

¶53    Given the total evidentiary picture presented here, we have reasonable doubt about whether the improperly admitted evidence made a difference in the outcome of this case. Accordingly, the State has not carried its burden of demonstrating that the error was harmless beyond a reasonable doubt. On this basis, we reverse Valdez's conviction and remand for further proceedings, including potentially a new trial.

II.

¶54    Valdez also raises a number of additional claims on appeal. First, he argues that his attorney rendered ineffective assistance of counsel in several respects, including the following: by failing to object to Second Detective's testimony opining on the veracity of Ex-Girlfriend's statements, and by failing to object to the length and detail of First Detective's narrative of the incident. Second, Valdez asserts that the trial court erred when it excluded Aunt's testimony. Because we reverse and remand for a new trial solely on the basis of the Fifth Amendment violation discussed above, we need not reach a decision on the merits of Valdez's other arguments. But we are troubled by certain aspects of how the trial proceeded and, in an effort to offer guidance that might be useful on remand, where these issues are likely to arise again, we briefly discuss some of Valdez's other arguments. *See, e.g., State v. Low*, 2008 UT 58, ¶ 61, 192 P.3d 867 (although reversing on another ground and remanding for new trial, nevertheless proceeding to comment on "other issues presented on appeal that will likely arise during retrial").

¶55    The testimony the State elicited from Second Detective regarding his opinion of the veracity of Ex-Girlfriend's statements was improper and inadmissible "vouching" testimony, and the trial court was correct to step in, of its own

accord, and strike that testimony. Our law "prohibits any testimony as to a witness's truthfulness on a particular occasion." *See State v. Rimmasch*, 775 P.2d 388, 391 (Utah 1989), *superseded in part by rule as stated in State v. Maestas*, 2012 UT 46, ¶ 121 n.134, 299 P.3d 892. And in our view, these principles would have applied not only to Second Detective's testimony that he believed Ex-Girlfriend was telling the truth, but also to his claims regarding his status as a sort of human lie detector, including his description of the techniques he employed in his efforts to ferret out lies. While we stop short of making any determination that Valdez's counsel rendered ineffective assistance[8] in not objecting to Second Detective's testimony in this regard, we note the impropriety of that testimony.

¶56 In addition, we are concerned about the State's—and the trial court's—conception of the scope of the so-called "police investigation exception" to the usual ban on hearsay testimony. In *State v. Collier*, 736 P.2d 231 (Utah 1987), our supreme court held that a police officer was allowed to testify that a confidential informant had told him, prior to a raid on a house, that an occupant was "armed and would not be taken alive." *Id.* at 233 (quotation simplified). The court held that this brief testimony, though consisting of another declarant's out-of-court statement that might otherwise be considered hearsay, was admissible because it "was not admitted to prove the truth of the information"—that the occupant of the house was in fact armed and refused to be taken alive—but "rather to explain the conduct of the police in setting up an armed stakeout of the [house]." *Id.* at 234. Other jurisdictions have likewise recognized that limited

---

8. To establish ineffective assistance of counsel, Valdez would have to show that his attorney's representation "fell below an objective standard of reasonableness" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984).

statements made by other declarants, and offered by testifying police officers, that serve to explain why police acted in a particular way may constitute admissible non-hearsay because the statements are not offered for the truth of the matter asserted. *See, e.g., Jones v. Basinger*, 635 F.3d 1030, 1044–45 (7th Cir. 2011) (stating that "an informant's out-of-court statement to law enforcement is not hearsay if that statement is offered into evidence as an explanation of why the subsequent investigation proceeded as it did" (quotation simplified)). But courts and commentators have noted that this hearsay "exception" carries the potential for abuse. *See, e.g., id.* at 1046 (stating that "statements offered to show 'background' or 'the course of the investigation' can easily violate a core constitutional right, are easily misused, and are usually no more than minimally relevant," and urging courts "asked to admit such statements for supposed non-hearsay purposes" to be "on the alert for such misuse"); *United States v. Cass*, 127 F.3d 1218, 1222–23 (10th Cir. 1997) (noting that the *McCormick on Evidence* treatise has "criticized the 'apparently widespread abuse' of [the police investigation exception]," and stating that proper use of the exception "involve[s] the admission of, at most, only a few limited statements" and not "scores of out-of-court statements"). While we do not purport to here set forth the precise parameters of the police investigation exception in Utah, or to decide whether Valdez's counsel performed deficiently under these circumstances by lodging a tardy objection to First Detective's testimony, it is our view that the entirety of First Detective's lengthy narrative testimony about what Ex-Girlfriend told him was not admissible under that exception.

¶57 Finally, we make brief mention of Valdez's assertion that Aunt should have been allowed to testify. On appeal—but not before the trial court—Valdez argues, citing *State v. Thompson*, 2014 UT App 14, ¶ 29, 318 P.3d 1221 (stating that rule 608(b) does not bar "evidence used to directly rebut a witness's testimony or other evidence"), that Aunt's testimony should have been allowed as ordinary impeachment evidence,

admissible to rebut Ex-Girlfriend's claim that she had largely attempted to avoid Valdez following their breakup. However, Valdez failed to make that argument before the trial court, arguing only that Aunt's testimony was admissible pursuant to rule 608(c). Both because this claim is unpreserved, and because we need not reach its merits in any event, we do not opine as to the ultimate admissibility of Aunt's testimony. But the argument is one that should be addressed on remand, should Valdez renew it there.

## CONCLUSION

¶58 Valdez's Fifth Amendment rights were violated when the trial court allowed Second Detective to testify about Valdez's refusal to provide the State his cell phone passcode, and the State argued, in turn, that the jury should infer from Valdez's refusal that no reconciliatory texts between Valdez and Ex-Girlfriend existed. Because the State impermissibly invited the jury to interpret Valdez's silence as an inference of his guilt, and because this error was not harmless beyond a reasonable doubt, we reverse and remand for further proceedings in accordance with this opinion.

_____